# EDDINGS *v.* OKLAHOMA

No. 80–5727.   Argued November 2, 1981—Decided January 19, 1982

POWELL, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., *post*, p. 117, and O'CONNOR, J., *post*, p. 117, filed concurring opinions. BURGER, C. J., filed a dissenting opinion, in which WHITE, BLACKMUN, and REHNQUIST, JJ., joined, *post*, p. 120.

*Jay C. Baker*, by appointment of the Court, 451 U. S. 981, argued the cause and filed a brief for petitioner.

*David W. Lee*, Assistant Attorney General of Oklahoma, argued the cause for respondent. With him on the brief were *Jan Eric Cartwright*, Attorney General, and *Tomilou Gentry Liddell*, Assistant Attorney General.*

JUSTICE POWELL delivered the opinion of the Court.

Petitioner Monty Lee Eddings was convicted of first-degree murder and sentenced to death. Because this sentence was imposed without "the type of individualized consideration of mitigating factors . . . required by the Eighth and Fourteenth Amendments in capital cases," *Lockett* v. *Ohio*, 438 U. S. 586, 606 (1978) (opinion of BURGER, C. J.), we reverse.

I

On April 4, 1977, Eddings, a 16-year-old youth, and several younger companions ran away from their Missouri homes. They traveled in a car owned by Eddings' brother, and drove

---

*Briefs of *amici curiae* urging reversal were filed by *M. Gail Robinson*, *Kevin Michael McNally*, and *J. Vincent Aprile II* for Kentucky Youth Advocates et al.; and by *Robert L. Walker* for the National Council on Crime and Delinquency et al.

*Daniel J. Popeo* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation as *amicus curiae*.

without destination or purpose in a southwesterly direction eventually reaching the Oklahoma Turnpike. Eddings had in the car a shotgun and several rifles he had taken from his father. After he momentarily lost control of the car, he was signalled to pull over by Officer Crabtree of the Oklahoma Highway Patrol. Eddings did so, and when the officer approached the car, Eddings stuck a loaded shotgun out of the window and fired, killing the officer.

Because Eddings was a juvenile, the State moved to have him certified to stand trial as an adult. Finding that there was prosecutive merit to the complaint and that Eddings was not amenable to rehabilitation within the juvenile system, the trial court granted the motion. The ruling was affirmed on appeal. *In re M. E.*, 584 P. 2d 1340 (Okla. Crim. App.), cert. denied *sub nom. Eddings* v. *Oklahoma*, 436 U. S. 921 (1978). Eddings was then charged with murder in the first degree, and the District Court of Creek County found him guilty upon his plea of *nolo contendere.*

The Oklahoma death penalty statute provides in pertinent part:

> "Upon conviction . . . of guilt of a defendant of murder in the first degree, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. . . . In the sentencing proceeding, evidence may be presented as to *any mitigating circumstances* or as to any of the aggravating circumstances enumerated in this act." Okla. Stat., Tit. 21, § 701.10 (1980) (emphasis added).

Section 701.12 lists seven separate aggravating circumstances; the statute nowhere defines what is meant by "any mitigating circumstances."

At the sentencing hearing, the State alleged three of the aggravating circumstances enumerated in the statute: that the murder was especially heinous, atrocious, or cruel, that the crime was committed for the purpose of avoiding or pre-

venting a lawful arrest, and that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. §§ 701.12 (4), (5), and (7).

In mitigation, Eddings presented substantial evidence at the hearing of his troubled youth. The testimony of his supervising Juvenile Officer indicated that Eddings had been raised without proper guidance. His parents were divorced when he was 5 years old, and until he was 14 Eddings lived with his mother without rules or supervision. App. 109. There is the suggestion that Eddings' mother was an alcoholic and possibly a prostitute. *Id.*, at 110–111. By the time Eddings was 14 he no longer could be controlled, and his mother sent him to live with his father. But neither could the father control the boy. Attempts to reason and talk gave way to physical punishment. The Juvenile Officer testified that Eddings was frightened and bitter, that his father overreacted and used excessive physical punishment: "Mr. Eddings found the only thing that he thought was effectful with the boy was actual punishment, or physical violence— hitting with a strap or something like this."[1] *Id.*, at 121.

Testimony from other witnesses indicated that Eddings was emotionally disturbed in general and at the time of the crime, and that his mental and emotional development were at a level several years below his age. *Id.*, at 134, 149, and 173. A state psychologist stated that Eddings had a sociopathic or antisocial personality and that approximately 30% of youths suffering from such a disorder grew out of it as they aged. *Id.*, at 137 and 139. A sociologist specializing in juvenile offenders testified that Eddings was treatable. *Id.*, at 149. A psychiatrist testified that Eddings could be rehabilitated by intensive therapy over a 15- to 20-year period.

---

[1] There was evidence that immediately after the shooting Eddings said: "I would rather have shot an Officer than go back to where I live." App. 93.

*Id.*, at 181. He testified further that Eddings "did pull the trigger, he did kill someone, but I don't even think he knew that he was doing it."[2] The psychiatrist suggested that, if treated, Eddings would no longer pose a serious threat to society. *Id.*, at 180–181.

At the conclusion of all the evidence, the trial judge weighed the evidence of aggravating and mitigating circumstances. He found that the State had proved each of the three alleged aggravating circumstances beyond a reasonable doubt.[3] Turning to the evidence of mitigating circumstances, the judge found that Eddings' youth was a mitigating factor of great weight: "I have given very serious consideration to the youth of the Defendant when this particular

---

[2] The psychiatrist suggested that, at the time of the murder, Eddings was in his own mind shooting his stepfather—a policeman who had been married to his mother for a brief period when Eddings was seven. The psychiatrist stated: "I think that given the circumstances and the facts of his life, and the facts of his arrested development, he acted as a seven year old seeking revenge and rebellion; and the act—he did pull the trigger, he did kill someone, but I don't even think he knew that he was doing it." *Id.*, at 172.

[3] The trial judge found first that the crime was "heinous, atrocious, and cruel" because "designed to inflict a high degree of pain . . . in utter indifference to the rights of Patrolman Crabtree." *Id.*, at 187. Second, the judge found that the crime was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." *Id.*, at 187–188. The evidence was sufficient to indicate that at the time of the offense Eddings did not wish to be returned to Missouri and that in stopping the car the officer's intent was to make a lawful arrest. Finally, the trial judge found that Eddings posed a continuing threat of violence to society. There was evidence that at one point on the day of the murder, after Eddings had been taken to the county jail, he told two officers that "if he was loose . . . he would shoot" them all. *Id.*, at 77. There was also evidence that at another time, when an officer refused to turn off the light in Eddings' cell, Eddings became angry and threatened the officer: "Now I have shot one of you people, and I'll get you too if you don't turn this light out." *Id.*, at 103. Based on these two "spontaneous utterances," *id.*, at 188, the trial judge found a strong likelihood that Eddings would again commit a criminal act of violence if released.

crime was committed. Should I fail to do this, I think I would not be carrying out my duty." *Id.*, at 188–189. But he would not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance: "[T]he Court cannot be persuaded entirely by the . . . fact that the youth was sixteen years old when this heinous crime was committed. *Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background.*" *Id.*, at 189 (emphasis added). Finding that the only mitigating circumstance was Eddings' youth and finding further that this circumstance could not outweigh the aggravating circumstances present, the judge sentenced Eddings to death.

The Court of Criminal Appeals affirmed the sentence of death. 616 P. 2d 1159 (1980). It found that each of the aggravating circumstances alleged by the State had been present.[4] It recited the mitigating evidence presented by Eddings in some detail, but in the end it agreed with the trial court that only the fact of Eddings' youth was properly considered as a mitigating circumstance:

> "[Eddings] also argues his mental state at the time of the murder. He stresses his family history in saying he was suffering from severe psychological and emotional disorders, and that the killing was in actuality an inevitable product of the way he was raised. There is no doubt that the petitioner has a personality disorder. But all the evidence tends to show that he knew the difference between right and wrong at the time he pulled the trigger, and that is the test of criminal responsibility

---

[4] We understand the Court of Criminal Appeals to hold that the murder of a police officer in the performance of his duties is "heinous, atrocious, or cruel" under the Oklahoma statute. See *Roberts* v. *Louisiana*, 431 U. S. 633, 636 (1977). However, we doubt that the trial judge's understanding and application of this aggravating circumstance conformed to that degree of certainty required by our decision in *Godfrey* v. *Georgia*, 446 U. S. 420 (1980). See n. 3, *supra*.

in this State. For the same reason, the petitioner's family history is useful in explaining why he behaved the way he did, but it does not excuse his behavior." *Id.*, at 1170 (citation omitted).

## II

In *Lockett* v. *Ohio*, 438 U. S. 586 (1978), CHIEF JUSTICE BURGER, writing for the plurality, stated the rule that we apply today:[5]

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*, at 604 (emphasis in original).

Recognizing "that the imposition of death by public authority is . . . profoundly different from all other penalties," the plurality held that the sentencer must be free to give "independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation . . . ." *Id.*, at 605. Because the Ohio death penalty statute only permitted consideration of three mitigating circumstances, the Court found the statute to be invalid.

As THE CHIEF JUSTICE explained, the rule in *Lockett* is the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual. Since the early days of the common law, the legal system has struggled to accommodate these twin objectives. Thus, the common law began by treating all criminal homicides as capital offenses, with a

---

[5] Because we decide this case on the basis of *Lockett* v. *Ohio*, we do not reach the question of whether—in light of contemporary standards—the Eighth Amendment forbids the execution of a defendant who was 16 at the time of the offense. Cf. *Bell* v. *Ohio*, 438 U. S. 637 (1978).

mandatory sentence of death. Later it allowed exceptions, first through an exclusion for those entitled to claim benefit of clergy and then by limiting capital punishment to murders upon "malice prepensed." In this country we attempted to soften the rigor of the system of mandatory death sentences we inherited from England, first by grading murder into different degrees of which only murder of the first degree was a capital offense and then by committing use of the death penalty to the absolute discretion of the jury. By the time of our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), the country had moved so far from a mandatory system that the imposition of capital punishment frequently had become arbitrary and capricious.

Beginning with *Furman*, the Court has attempted to provide standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the accused. Thus, in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), the principal opinion held that the danger of an arbitrary and capricious death penalty could be met "by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Id.*, at 195. By its requirement that the jury find one of the aggravating circumstances listed in the death penalty statute, and by its direction to the jury to consider "any mitigating circumstances," the Georgia statute properly confined and directed the jury's attention to the circumstances of the particular crime and to "the characteristics of the person who committed the crime . . . ." *Id.*, at 197.[6]

Similarly, in *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), the plurality held that mandatory death sentencing was not a permissible response to the problem of arbitrary

---

[6] "[T]he jury's attention is focused on the characteristics of the person who committed the crime: . . . Are there any special facts about this defendant that mitigate against imposing capital punishment (*e. g.*, his youth, the extent of his cooperation with the police, his emotional state at the time of the crime)." 428 U. S., at 197.

jury discretion. As the history of capital punishment had shown, such an approach to the problem of discretion could not succeed while the Eighth Amendment required that the individual be given his due: "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.*, at 304.[7] See *Roberts (Harry)* v. *Louisiana*, 431 U. S. 633 (1977); *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S. 325 (1976).

Thus, the rule in *Lockett* followed from the earlier decisions of the Court and from the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all. By requiring that the sentencer be permitted to focus "on the characteristics of the person who committed the crime," *Gregg* v. *Georgia, supra,* at 197, the rule in *Lockett* recognizes that "justice . . . requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania* v. *Ashe*, 302 U. S. 51, 55 (1937). By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in *Lockett* recognizes that a consistency produced by ignoring individual differences is a false consistency.

## III

We now apply the rule in *Lockett* to the circumstances of this case. The trial judge stated that "in following the law,"

---

[7] "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings . . . ." 428 U. S., at 304.

he could not "consider the fact of this young man's violent background." App. 189. There is no dispute that by "violent background" the trial judge was referring to the mitigating evidence of Eddings' family history.[8] From this statement it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence.

The Court of Criminal Appeals took the same approach. It found that the evidence in mitigation was not relevant because it did not tend to provide a legal excuse from criminal responsibility. Thus the court conceded that Eddings had a "personality disorder," but cast this evidence aside on the basis that "he knew the difference between right and wrong . . . and that is the test of criminal responsibility." 616 P. 2d, at 1170. Similarly, the evidence of Eddings' family history was "useful in explaining" his behavior, but it did not "excuse" the behavior. From these statements it appears that the Court of Criminal Appeals also considered only that evidence to be mitigating which would tend to support a legal excuse from criminal liability.

We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett.*[9] Just as the State may not by statute preclude

---

[8] Brief for Respondent 55 ("the inference that can be drawn is that the court did not consider petitioner's juvenile record and family life to be a mitigating circumstance"); Tr. of Oral Arg. 36 ("the trial court did not consider the fact of his family background as a mitigating circumstance. . . . [T]he violent background, which I assume he meant was . . . [that Eddings] was subject to some slapping around and some beating by his father") (argument of respondent).

[9] Eddings argued to the Court of Criminal Appeals that imposition of the death penalty in the particular circumstances of his case, and in light of the mitigating factors present, was excessive punishment under the Eighth Amendment. But he did not specifically argue that the trial judge erred in refusing to consider relevant mitigating circumstances in the process of

the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may

---

sentencing. In rejecting his claim of excessive punishment, the court examined the aggravating and mitigating circumstances and held that Eddings' family history and emotional disorder were *not* mitigating circumstances that ought to be weighed in the balance. The court's holding that these factors were irrelevant to an inquiry into excessiveness was also a holding that they need not have been considered by the sentencer in imposing capital punishment. Similarly, Eddings' argument in his petition for certiorari that imposition of the death penalty was excessive on the facts of this case comprises the argument that the sentencer erred in refusing to consider relevant mitigating circumstances proffered by him at the sentencing hearing. In short, although neither the opinion of the Court of Criminal Appeals nor Eddings' petition for certiorari spoke to our decision in *Lockett* by name, the question of whether the decisions below were consistent with our decision in *Lockett* is properly before us. Our jurisdiction does not depend on citation to book and verse. See, *e. g., New York ex rel. Bryant v. Zimmerman*, 278 U. S. 63, 67 (1928).

Although Eddings' petition for certiorari did not expressly present the *Lockett* issue, his brief in this Court argued it, and the State responded to the argument. Brief for Petitioner 64–67; Brief for Respondent 55–57. The dissenting opinion of THE CHIEF JUSTICE, *post*, at 120, n. 1, states that the courts below were not afforded the opportunity to consider this issue. The fact is, however, that in his petition to the Court of Criminal Appeals for a rehearing, Eddings specifically presented the issue and at some considerable length. See Petition for Re-Hearing and Supporting Brief in No. C–78–325, p. 10 ("This Court, by its interpretation of mitigating circumstances, has effectively limited the scope of mitigation and that limitation renders the Oklahoma death penalty statute unconstitutional"). The Court of Criminal Appeals denied the petition, stating that it had given it full consideration and had been "fully advised in the premises." See Rule 1.18, Rules of the Court of Criminal Appeals (1980) (court will entertain new arguments upon a petition for rehearing). Cf. *Cox Broadcasting Corp. v. Cohn*, 420 U. S. 469, 476 (1975). See also *Wood v. Georgia*, 450 U. S. 261, 265, n. 5 (1981); *Beck v. Alabama*, 447 U. S. 625, 631, n. 6 (1980); *Vachon v. New Hampshire*, 414 U. S. 478, 479, n. 3 (1974).

determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration.[10]

Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence.  Eddings was a youth of 16 years at the time of the murder.  Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.  See *McGautha* v. *California*, 402 U. S. 183, 187–188, 193 (1971).  In some cases, such evidence properly may be given little weight.  But when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant.

The trial judge recognized that youth must be considered a relevant mitigating factor.  But youth is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.[11]  Our history is replete with laws and judicial recognition that minors, especially in their earlier years, gener-

---

[10] We note that the Oklahoma death penalty statute permits the defendant to present evidence "as to any mitigating circumstances."  Okla. Stat., Tit. 21, § 701.10 (1980).  *Lockett* requires the sentencer to listen.

[11] "Adolescents everywhere, from every walk of life, are often dangerous to themselves and to others."  The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 41 (1967).  "[A]dolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults.  Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults.  Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth."  Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978).

ally are less mature and responsible than adults.[12]  Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults.  *Bellotti* v. *Baird*, 443 U. S. 622, 635 (1979).

Even the normal 16-year-old customarily lacks the maturity of an adult.  In this case, Eddings was not a normal 16-year-old; he had been deprived of the care, concern, and paternal attention that children deserve.  On the contrary, it is not disputed that he was a juvenile with serious emotional problems, and had been raised in a neglectful, sometimes even violent, family background.  In addition, there was testimony that Eddings' mental and emotional development were at a level several years below his chronological age.  All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case.  Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing.

We are not unaware of the extent to which minors engage increasingly in violent crime.[13]  Nor do we suggest an absence of legal responsibility where crime is committed by a minor.  We are concerned here only with the manner of the imposition of the ultimate penalty: the death sentence imposed for the crime of murder upon an emotionally disturbed youth with a disturbed child's immaturity.

---

[12] As Justice Frankfurter stated, "[c]hildren have a very special place in life which law should reflect." *May* v. *Anderson*, 345 U. S. 528, 536 (1953) (concurring opinion).  And indeed the law does reflect this special place.  Every State in the country makes some separate provision for juvenile offenders.  See *In re Gault*, 387 U. S. 1, 14 (1967).

[13] See, *e. g.*, National Advisory Committee on Criminal Justice Standards and Goals, Task Force Report on Juvenile Justice and Delinquency Prevention 3 (1976).

On remand, the state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances. We do not weigh the evidence for them. Accordingly, the judgment is reversed to the extent that it sustains the imposition of the death penalty, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion without, however, departing from my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976) (dissenting opinion).

JUSTICE O'CONNOR, concurring.

I write separately to address more fully the reasons why this case must be remanded in light of *Lockett* v. *Ohio*, 438 U. S. 586 (1978), which requires the trial court to consider and weigh all of the mitigating evidence concerning the petitioner's family background and personal history.*

Because sentences of death are "qualitatively different" from prison sentences, *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, POWELL, and

---

*Despite THE CHIEF JUSTICE's argument that we may not consider the *Lockett* issue because it was never fairly presented to the court below, there is precedent for this Court to consider the merits of the issue. In *Wood* v. *Georgia*, 450 U. S. 261, 265, n. 5 (1981), this Court wrote:

"Even if one considers that the conflict-of-interest question was not technically raised below, there is ample support for a remand required in the interests of justice. See 28 U. S. C. § 2106 (authorizing this Court to 'require such further proceedings to be had as may be just under the circumstances')."

Because the trial court's failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand this case for resentencing.

STEVENS, JJ.), this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake. Surely, no less can be required when the defendant is a minor. One example of the measures taken is in *Lockett* v. *Ohio, supra,* where a plurality of this Court wrote:

> "There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.,* at 605 (opinion of BURGER, C. J.).

In order to ensure that the death penalty was not erroneously imposed, the *Lockett* plurality concluded that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* at 604 (emphasis in original) (footnote omitted).

In the present case, of course, the relevant Oklahoma statute permits the defendant to present evidence of any mitigating circumstance. See Okla. Stat., Tit. 21, § 701.10 (1980). Nonetheless, in sentencing the petitioner (which occurred about one month before *Lockett* was decided), the judge remarked that he could not "in following the law . . . consider

the fact of this young man's violent background." App. 189. Although one can reasonably argue that these extemporaneous remarks are of no legal significance, I believe that the reasoning of the plurality opinion in *Lockett* compels a remand so that we do not "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." 438 U. S., at 605.

I disagree with the suggestion in the dissent that remanding this case may serve no useful purpose. Even though the petitioner had an opportunity to present evidence in mitigation of the crime, it appears that the trial judge believed that he could not consider some of the mitigating evidence in imposing sentence. In any event, we may not speculate as to whether the trial judge and the Court of Criminal Appeals actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances, or whether the difference between this Court's opinion and the trial court's treatment of the petitioner's evidence is "purely a matter of semantics," as suggested by the dissent. *Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court.

THE CHIEF JUSTICE may be correct in concluding that the Court's opinion reflects a decision by some Justices that they would not have imposed the death penalty in this case had they sat as the trial judge. See *post*, at 127. I, however, do not read the Court's opinion either as altering this Court's opinions establishing the constitutionality of the death penalty or as deciding the issue of whether the Constitution permits imposition of the death penalty on an individual who committed a murder at age 16. Rather, by listing in detail some of the circumstances surrounding the petitioner's life, the Court has sought to emphasize the variety of mitigating information that may not have been considered by the trial court in deciding whether to impose the death penalty or some lesser sentence.

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE, JUSTICE BLACKMUN, and JUSTICE REHNQUIST join, dissenting.

It is important at the outset to remember—as the Court does not—the narrow question on which we granted certiorari. We took care to limit our consideration to whether the Eighth and Fourteenth Amendments prohibit the imposition of a death sentence on an offender because he was 16 years old in 1977 at the time he committed the offense; review of all other questions raised in the petition for certiorari was denied. 450 U. S. 1040 (1981). Yet the Court today goes beyond the issue on which review was sought—and granted—to decide the case on a point raised for the first time in petitioner's brief to this Court. This claim was neither presented to the Oklahoma courts nor presented to this Court in the petition for certiorari.[1] Relying on this "11th-hour" claim, the Court strains to construct a plausible legal theory to support its mandate for the relief granted.

## I

In *Lockett* v. *Ohio*, 438 U. S. 586 (1978), we considered whether Ohio violated the Eighth and Fourteenth Amendments by sentencing Lockett to death under a statute that "narrowly limit[ed] the sentencer's discretion to consider the

---

[1] The Court struggles to demonstrate that "the question of whether the decisions below were consistent with our decision in *Lockett* is properly before us." *Ante*, at 113–114, n. 9. It argues that petitioner's "*Lockett* claim" was somehow inherent in his general assertion that the death penalty was "excessive." However, it is obvious that petitioner not only failed to present to this Court the question which the Court now addresses, but also never "fairly presented" the *Lockett* argument to the state courts so as to have afforded them the first "opportunity to apply controlling legal principles to the facts bearing upon [his] constitutional claim." *Picard* v. *Connor*, 404 U. S. 270, 275–277 (1971). Indeed, petitioner concedes as much, admitting that the "*Lockett* error was not enumerated or argued on appeal to the Oklahoma Court of Criminal Appeals . . . ." Brief for Petitioner 64.

circumstances of the crime and the record and character of the offender as mitigating factors." *Id.*, at 589. The statute at issue, Ohio Rev. Code §§ 2929.03–2929.04(B) (1975), required the trial court to impose the death penalty upon Lockett's conviction for "aggravated murder with specifications,"[2] unless it found "that (1) the victim had induced or facilitated the offense, (2) it was unlikely that Lockett would have committed the offense but for the fact that she 'was under duress, coercion, or strong provocation,' or (3) the offense was 'primarily the product of [Lockett's] psychosis or mental deficiency.'" 438 U. S., at 593–594. It was plain that although guilty of felony homicide under Ohio law, Lockett had played a relatively minor role in a robbery which resulted in a homicide actually perpetrated by the hand of another. Lockett had previously committed no major offenses; in addition, a psychological report described her "prognosis for rehabilitation" as "favorable." *Id.*, at 594. However, since she was not found to have acted under duress, did not suffer from "psychosis," and was not "mentally deficient," the sentencing judge concluded that he had "'no alternative, whether [he] like[d] the law or not' but to impose the death penalty." *Ibid.*

We held in *Lockett* that the "Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*, at 604 (emphasis in original). We therefore found the Ohio statute flawed, be-

---

[2] In that case the evidence showed that while Lockett waited in a "getaway" car, her three companions robbed a store; during the robbery, the proprietor was fatally wounded. Lockett was charged with aggravated murder with two "specifications" of "aggravating circumstances": (1) that the murder was "committed for the purpose of escaping detection, apprehension, trial, or punishment" for aggravated robbery; and (2) that the murder was "committed while . . . committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated robbery." See Ohio Rev. Code § 2929.04(A) (1975).

cause it did not permit individualized consideration of mitigating circumstances—such as the defendant's comparatively minor role in the offense, lack of intent to kill the victim, or age. *Id.*, at 606–608. We did not, however, undertake to dictate the *weight* that a sentencing court must ascribe to the various factors that might be categorized as "mitigating," nor did we in any way suggest that this Court may substitute its sentencing judgment for that of state courts in capital cases.

In contrast to the Ohio statute at issue in *Lockett*, the Oklahoma death penalty statute provides:

> "In the sentencing proceeding, evidence may be presented as to *any* mitigating circumstances or as to any of the aggravating circumstances enumerated in this act." Okla. Stat., Tit. 21, § 701.10 (1980) (emphasis added).

The statute further provides that

> "[u]nless at least one of the statutory aggravating circumstances enumerated in this act is [found to exist beyond a reasonable doubt] or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed." § 701.11.

This provision, of course, instructs the sentencer to weigh the mitigating evidence introduced by a defendant against the aggravating circumstances proved by the State.[3]

The Oklahoma statute thus contains provisions virtually identical to those cited with approval in *Lockett*, as examples of proper legislation which highlighted the Ohio statute's "constitutional infirmities." 438 U. S., at 606–607. Indeed, the Court does not contend that the Oklahoma sentencing

---

[3] It is ironic that in his petition for certiorari filed with the Oklahoma Court of Criminal Appeals, petitioner asserted that the Oklahoma sentencing scheme was constitutionally deficient, because "[t]he mitigating circumstances which may be considered are not statutorily defined *or limited*" (emphasis added).

provisions are inconsistent with *Lockett*. Moreover, the Court recognizes that, as mandated by the Oklahoma statute, Eddings was permitted to present "substantial evidence at the [sentencing] hearing of his troubled youth." *Ante*, at 107.[4]

In its attempt to make out a violation of *Lockett*, the Court relies entirely on a single sentence of the trial court's opinion delivered from the bench at the close of the sentencing hearing. After discussing the aggravated nature of petitioner's offense, and noting that he had "given very serious consideration to the youth of the Defendant when this particular crime was committed," the trial judge said that he could not

---

[4] Although I think it is immaterial to a correct decision of this case, it is worth noting that the Court overstates and oversimplifies the evidence presented by Eddings at the sentencing hearing. For example, it twice characterizes the testimony as indicating that, at the time of the crime, Eddings' "mental and emotional development were at a level several years below his age." *Ante*, at 107, 116. Dr. Dietsche, a psychologist, testified that if forced to extrapolate from the Wechsler Adult Intelligence Scale he would place petitioner's "mental age" at about 14 years, 6 months; however, he then said that this mental age would have "no meaning" since "the mental age concepts break down . . . between fourteen to sixteen years of age." He went on to state: *"My opinion is that [Eddings] has the intelligence of an adult."* App. 134–136 (emphasis added). Describing a single interview with petitioner while he was awaiting trial on murder charges, Dr. Rettig, a sociologist, said that petitioner's "responses appeared to me to be several years below his chronological age"; he "qualif[ied]" this answer, however, by noting that petitioner was "under a great deal of constraint in the atmosphere in which I saw him." *Id.*, at 149. Finally, Dr. Gagliano, a psychiatrist, opined on the basis of a one-hour interview—during which petitioner's attorney was present and refused to allow questioning about petitioner's "mental status" on the day of the shooting, *id.*, at 177—that at the time petitioner pulled the trigger, "he acted as a seven year old seeking revenge and rebellion" against his stepfather, a policeman. *Id.*, at 172–173. Dr. Gagliano was also willing to state categorically, on the basis of this single interview, and without reference to the results of the psychological testing of Eddings, *id.*, at 174, that Eddings was "preordained" to commit the murder from the time his parents were divorced, when he was five. *Id.*, at 179–180. This sort of "determinist" approach is rejected by an overwhelming majority of psychiatrists.

"be persuaded entirely by the . . . fact that the youth was sixteen years old when this heinous crime was committed. Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background." App. 189.

From this statement, the Court concludes "it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact, rather he found that *as a matter of law* he was unable even to consider the evidence." *Ante*, at 113. This is simply not a correct characterization of the sentencing judge's action.

In its parsing of the trial court's oral statement, the Court ignores the fact that the judge was delivering his opinion extemporaneously from the bench, and could not be expected to frame each utterance with the specificity and precision that might be expected of a written opinion or statute. Extemporaneous courtroom statements are not often models of clarity. Nor does the Court give any weight to the fact that the trial court had spent considerable time listening to the testimony of a probation officer and various mental health professionals who described Eddings' personality and family history—an obviously meaningless exercise if, as the Court asserts, the judge believed he was barred "as a matter of law" from "considering" their testimony. Yet even examined in isolation, the trial court's statement is at best ambiguous;[5] it can just as easily be read to say that, while the court

---

[5] It is not even clear what the trial court meant by Eddings' "violent background." For example, Eddings' probation officer testified that Eddings had "problems with fighting" while in school, and had once been charged with "Assault with intent to do great bodily harm." *Id.*, at 106–107. The State seems to concede, however, that the court was probably referring, at least in part, to Eddings' family history. See Brief for Respondent 55 ("the inference that can be drawn is that the court did not consider petitioner's *juvenile record and* family life to be a mitigating circumstance") (emphasis added). But cf. Tr. of Oral Arg. 35 ("the remark is

had taken account of Eddings' unfortunate childhood, it did not consider that either his youth or his family background was sufficient to offset the aggravating circumstances that the evidence revealed. Certainly nothing in *Lockett* would preclude the court from making such a determination.

The Oklahoma Court of Criminal Appeals independently examined the evidence of "aggravating" and "mitigating" factors presented at Eddings' sentencing hearing. 616 P. 2d 1159 (1980). After reviewing the testimony concerning Eddings' personality and family background, and after referring to the trial court's discussion of mitigating circumstances, it stated that while Eddings' "family history is useful in explaining why he behaved the way he did, . . . *it does not excuse his behavior.*" *Id.*, at 1170 (emphasis added). From this the Court concludes that "the Court of Criminal Appeals also considered only that evidence to be mitigating which would tend to support a legal excuse from criminal liability." *Ante*, at 113.[6] However, there is no reason to read that court's statements as reflecting anything more than a conclusion that Eddings' background was not a sufficiently mitigating factor to tip the scales, given the aggravating circumstances, including Eddings' statements immediately before the killing.[7] The Court of Criminal Appeals most assuredly did *not*, as the Court's opinion suggests, hold that this "evidence in mitigation was not relevant," see *ibid.*; indeed, had the Court of Criminal Appeals thought the evidence irrele-

---

ambiguous. It could be interpreted to mean that [the trial court] was not going to consider the juvenile's previous juvenile record in Missouri, which was extensive . . .").

[6] On the other hand, the Court's opinion concedes that petitioner's *youth* was given serious consideration as a "mitigating circumstance," although his age at the time of the offense would not "tend to support a legal excuse from criminal responsibility."

[7] When Eddings' companions informed him that the officer's patrol car was approaching, Eddings responded that if the "mother . . . pig tried to stop him he was going to blow him away." App. 66.

vant, it is unlikely that it would have spent several para-
graphs summarizing it. The Court's opinion offers no rea-
sonable explanation for its assumption that the Court of
Criminal Appeals considered itself bound by some unstated
legal principle not to "consider" Eddings' background.

To be sure, neither the Court of Criminal Appeals nor the
trial court labeled Eddings' family background and personal-
ity disturbance as "mitigating factors." It is plain to me,
however, that this was purely a matter of semantics associ-
ated with the rational belief that "evidence in mitigation"
must rise to a certain level of persuasiveness before it can be
said to constitute a "mitigating circumstance." In contrast,
the Court seems to require that any potentially mitigating
evidence be described as a "mitigating factor"—regardless of
its weight; the insubstantiality of the evidence is simply to be
a factor in the process of weighing the evidence against
aggravating circumstances. Yet if this is all the Court's
opinion stands for, it provides scant support for the re-
sult reached. For it is clearly the choice of the Oklahoma
courts—a choice not inconsistent with *Lockett* or any other
decision of this Court—to accord relatively little weight to
Eddings' family background and emotional problems as bal-
anced against the circumstances of his crime and his potential
for future dangerousness.[8]

---

[8] Nor is this choice necessarily an unreasonable one. As the Court
notes, "[e]vidence of a difficult family history and of emotional disturbance
is typically introduced by defendants in mitigation." *Ante*, at 115. One
might even be surprised if a person capable of a brutal and unprovoked kill-
ing of a police officer did not suffer from some sort of "personality
disorder."

Indeed, Dr. Dietsche, who testified that Eddings had a "sociopathic or
antisocial personality," see *ante*, at 107, estimated that 91% "of your crimi-
nal element" would test as sociopathic or antisocial. App. 136. Dr.
Dietsche defined "antisocial personalities" as individuals without "the usual
type of companions" or "loyalties," who are "[f]requently . . . selfish, . . .
very impulsive," showing "little in the line of responsibility" or concern "for
the needs or wants of others," and "hav[ing] little in the line of guilt or

## II

It can never be less than the most painful of our duties to pass on capital cases, and the more so in a case such as this one. However, there comes a time in every case when a court must "bite the bullet."

Whether the Court's remand will serve any useful purpose remains to be seen, for petitioner has already been given an opportunity to introduce whatever evidence he considered relevant to the sentencing determination. Two Oklahoma courts have weighed that evidence and found it insufficient to offset the aggravating circumstances shown by the State. The Court's opinion makes clear that some Justices who join it would not have imposed the death penalty had they sat as the sentencing authority, see, *e. g.*, *ante*, at 115–116. In-

---

remorse." *Id.*, at 137–138. Although the Court describes Dietsche's testimony as indicating that "approximately 30% of youths suffering from such a disorder grew out of it as they aged," *ante*, at 107, Dietsche was in fact describing a study which he thought had subsequently been discredited. App. 139–141. Even that study, however, concluded that most of those who "grew out of" the disorder by the age of 35 or 40 were "more of a con-artist type" and "not . . . the assaultive type." *Ibid.* A more recent study estimated that only 20% of sociopathic persons were "treatable," *id.*, at 141; in this study, only 9 of 255 initial participants were successfully treated, after "literally . . . thousands of hours of therapy." *Id.*, at 142. Thus, characterization of Eddings as a "sociopath" may connote little more than that he is egocentric, concerned only with his own desires and unremorseful, has a propensity for criminal conduct, and is unlikely to respond well to conventional psychiatric treatment—hardly significant "mitigating" factors. See *Blocker* v. *United States*, 110 U. S. App. D. C. 41, 48–49, and nn. 11, 12, 288 F. 2d 853, 860–861, and nn. 11, 12 (1961) (Burger, J., concurring in result). While the Court speaks of Eddings' "severe emotional disturbance," *ante*, at 115; see also *ante*, at 116, it appears to be referring primarily to the testimony that Eddings was a sociopath, and to Dr. Gagliano's rather fantastic speculation concerning Eddings' dissociation at the time of the crime, see n. 4, *supra*. The Court's opinion exemplifies the proposition that the very occurrence of the crime functions as a powerful impetus to search for a theory to explain it. See Szasz, Psychiatry, Ethics, and the Criminal Law, 58 Colum. L. Rev. 183, 190–191 (1958).

deed, I am not sure I would have done so. But the Constitution does not authorize us to determine whether sentences imposed by state courts are sentences we consider "appropriate"; our only authority is to decide whether they are constitutional under the Eighth Amendment. The Court stops far short of suggesting that there is any constitutional proscription against imposition of the death penalty on a person who was under age 18 when the murder was committed. In the last analysis, the Court is forced to conclude that it is "the state courts [which] must consider [petitioner's mitigating evidence] and weigh it against the evidence of the aggravating circumstances. We do not weigh the evidence for them." *Ante*, at 117.

Because the sentencing proceedings in this case were in no sense inconsistent with *Lockett* v. *Ohio*, 438 U. S. 586 (1978), I would decide the sole issue on which we granted certiorari, and affirm the judgment.