MARY Beth Kelly, j.
(dissenting). I respectfully dissent. I believe that Detective Brett Stiles engaged in the “functional equivalent” of express questioning by exploiting defendant’s youth, a characteristic that made him particularly susceptible to Stiles’s compulsive techniques. Because this constituted “interrogation” and defendant had invoked his right to remain silent, I would reverse the judgment of the Court of Appeals and suppress defendant’s statement.
It is a violation of the principles announced in Miranda v Arizona to interrogate a suspect after he or she invokes the right to remain silent.[1] An “interrogation” occurs when an individual in custody is subjected to either “express questioning” or its “functional equivalent.”[2] As either express questioning or its functional equivalent, “interrogation” requires “a measure of compulsion above and beyond that inherent in custody itself,” and it generally must consist of more than mere “subtle compulsion.”[3] Rhode Island v Innis explained that the “functional equivalent” prong of interrogation involves “any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *231 reasonably likely to elicit an incriminating response from the suspect.”[4] In determining whether police words or actions amount to the functional equivalent of express questioning, we focus on the perceptions of the suspect, rather than the intent of the police.[5] However, any knowledge that the police may have concerning a defendant’s unusual susceptibility to a particular form of persuasion may be an important factor in determining whether the police should have known their conduct would elicit an incriminating response.[6]
In circumstances such as those presented here, a defendant’s youth might make him or her particularly vulnerable to police interrogation tactics and constitute the type of unusual susceptibility contemplated in In-nis. The United States Supreme Court has spoken extensively about the unique characteristics of minors, recognizing that they are generally wanting in maturity, more susceptible to outside influences, and “ ‘often lacking] the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them . . . .’ ”[7] These characteristics describe minors generally as a class and are readily apparent, indeed “self-evident,” to all adult observers.[8] Moreover, these commonsense observations about the nature of adoles *232 cents have been corroborated by developments in psychology and brain science.[9] Given the unique characteristics of minors, they have long been afforded a special regard in the law, subjected to unique standards in areas such as contract enforcement, the ability to marry, and even the ability to vote and to serve on juries.[10]
In the custodial-interrogation context, the unique attributes of minors require courts to exercise “special care” in their scrutiny of the record.[11] Courts should be mindful that, as compared to an adult, a juvenile suspect faces a more acute risk of succumbing to the inherent pressures of custodial interrogation such that the juvenile might “ ‘speak where he would not otherwise do so freely.’ ”[12] A suspect’s age may shape the suspect’s reasonable perception of whether he or she is in police “custody”[13] and affect the suspect’s response to police questioning and conduct.[14]
Because juveniles often lack the wherewithal to resist police pressures, they thus become uniquely susceptible *233 to police interrogative efforts, including subtly compulsive techniques, and should reasonably be expected to respond to those efforts. Police officers interacting with a minor suspect must be charged with knowledge of the particular vulnerabilities of minors because youthful characteristics are “self-evident to anyone who was a child once himself, including any police officer or judge.”[15] To allow the police to exploit the susceptibilities of minors who have invoked the right to remain silent, i.e., to allow the interrogation of a suspect after he or she invokes his right to remain silent, would run afoul of both Innis and Miranda.[16] As such, when a custodial interrogation involved a minor suspect who asserted his or her right to remain silent, courts considering whether the minor was subjected to the functional equivalent of interrogation must be especially mindful of the unique susceptibility that results from youth and the role that the defendant’s age played in the defendant’s perception of the circumstances.
In this case, Stiles should have recognized that defendant’s age made him especially susceptible to subtle compulsive efforts and that such conduct would likely elicit an incriminating response. Given defendant’s age of 17 years[17] and lack of any criminal record, *234 it would have been readily apparent that defendant lacked the experience and perspective to make decisions in his best interests or to avoid succumbing to police pressure. Rather than “scrupulously honor[]” defendant’s unequivocal invocation of his right to remain silent,[18] Stiles subjected the minor suspect to continued police pressure, which included references to violence, attempts to earn defendant’s trust, and appeals to defendant’s conscience:
[Stiles]: Okay. [T]his is what they call the acknowledgment and waiver paragraph [and] I’m going to read this to you. If you wish to talk to me, I’m going to need you to sign and date [the] form. Even though you sign and date the form, you still have your rights to stop at any time you wish. Do you understand that?
[.Defendant]: No. No thank you sir. I’m not going to sign it.
[Stiles]: Okay. Okay. Sounds good.
[Defendant]: I don’t even want to speak.
[iSíiZes]: I understand. I understand Kadeem.
Okay then. The only thing I can tell you Kadeem, is good luck man.
Okay. Don’t take this personal. It’s not personal between me and you, I think I may have had one contact with you on the street. Okay. I’ve got to do my job. And I understand you’ve got to [do] what you’ve got to do to protect your best interests. Okay.
The only thing that I can tell you is this, and I’m not asking you questions, I’m just telling you. I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay?
All right?
*235 [Defendant]-. I didn’t even mean for it to happen like that. It was a complete accident.
CSíiZes]: I understand. I understand.
But like I said, you, uhh, you get your attorney, man.
Hey, look dude, I don’t think you’re a monster, all right? I don’t think that. You could have came down to me and turned yourself in and there ain’t no damn way I’d beat you up.
[Defendant]: Yeah.
[SiiZes]: Okay, man?
You all set, you straight with me?
Who knows you’re here? Who knows of your family? Because I know a lot of your family in town now.
[Defendant]: ([UJnintelligible reply).
I know that I didn’t mean to do it. I guarantee that, I know I didn’t mean to do it.[19]
Considering the entirety of the exchange, several comments appear designed to foster an atmosphere in which defendant would be reasonably likely to make an incriminating response.[20] Particularly, Stiles initially *236 attempted to put defendant at ease, to portray himself as a neutral party rather than an adversary in an interrogation. He wished defendant “good luck” and told him: “Don’t take this personal. It’s not personal between me and you . . ..” He also assured defendant that “I understand you’ve got to [do] what you’ve got to do to protect your best interests.” Having presented himself as reasonable and understanding, Stiles invited defendant to make an incriminating response, telling defendant, “I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay?” Examining the remarks from the viewpoint of a teenager facing an authority figure in an interrogation room, I believe it reasonably foreseeable that the type of subtle coercive techniques Stiles used would prompt defendant to provide an incriminating response. As would be expected, defendant incriminated himself by stating, “I didn’t even mean for it to happen like that. It was a complete accident.”
Even after defendant demonstrated his youthful vulnerability to subtle compulsion, Stiles continued the interview, again presenting himself as a reasonable individual in whom defendant could confide, telling defendant, “I understand. I understand,” and assuring defendant that he did not view him as “a monster.” The detective then interjected a reference to violence into the conversation, telling defendant: “Hey, look dude, I don’t think you’re a monster, all right? I don’t think that. You could have came down to me and turned yourself in and there ain’t no damn way I’d beat you up.” Such references to violence in the isolation of an interrogation room would reasonably increase the anxiety experienced by a youthful suspect. At the same time, *237 Stiles also sought to establish ties with defendant, professing a familiarity with defendant’s family members in town and asking defendant: “Who knows you’re here? Who knows of your family? Because I know a lot of your family in town now.” Not surprisingly, the overwhelmed adolescent again responded with an incriminating statement, telling Stiles: “I know that I didn’t mean to do it. I guarantee that, I know I didn’t mean to do it.”
When examined in their entirety, Stiles’s remarks included a number of police tactics to which a vulnerable youth would be readily susceptible. The colloquy involved efforts to establish a rapport with defendant, including references to his family, while in the same conversation, Stiles also managed to heighten the inherent stress of a custodial situation by referring to violence. It was in this context that Stiles made the most obvious overture to elicit an incriminating response from defendant: the remark about the gun’s location. While Stiles’s remarks might not be reasonably likely to elicit an incriminating response from an adult, all these comments considered together, and in context, made it reasonably likely that the minor defendant in this case would respond in an incriminating manner. Consequently, because defendant’s youthful susceptibility to compulsion would have been readily apparent and Stiles should have known that his remarks were reasonably likely to elicit an incriminating response, I would hold that defendant was subjected to interrogation after he invoked his right to remain silent and I would suppress his statement.
MCCORMACK, J., took no part in the decision of this case.

 Miranda v Arizona, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 Rhode Island v Innis, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

 Id. at 300, 303 (quotation marks and citation omitted).

 Id. at 301 (emphasis added).

 Id. The intent of the police is relevant only insofar as it bears “on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.” Id. at 301 n 7.

 Id. at 302 n 8.

 JDB v North Carolina, 564 US_,_; 131 S Ct 2394, 2403; 180 L Ed 2d 310 (2011), quoting Bellotti v Baird, 443 US 622, 635; 99 S Ct 3035; 61 L Ed 2d 797 (1979); see also Eddings v Oklahoma, 455 US 104, 115; 102 S Ct 869; 71 L Ed 2d 1 (1982) (recognizingyouth as a “time and condition of life when a person may be most susceptible to influence and to psychological damage”).

 JDB, 564 US at_; 131 S Ct at 2403; see also Roper v Simmons, 543 US 551, 569; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

 Graham v Florida, 560 US_,_; 130 S Ct 2011, 2026; 176 L Ed 2d 825 (2010) (“[Djevelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.”).

 JDB, 564 US at__,; 131 S Ct at 2403-2404; Roper, 543 US at 569.

 Haley v Ohio, 332 US 596, 599; 68 S Ct 302; 92 L Ed 224 (1948); see also Gallegos v Colorado, 370 US 49, 54; 82 S Ct 1209; 8 L Ed 2d 325 (1962) (recognizing that a teenager, “no matter how sophisticated,” may not be “compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions”).

 JDB, 564 US at_; 131 S Ct at 2401, quoting Miranda, 384 US at 467.

 See JDB, 564 US at_; 131 S Ct at 2403 (“[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.”).

 Haley, 332 US at 599 (concluding police conduct “which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens”).

 JDB, 564 US at_; 131 S Ct at 2403.

 Innis, 446 US at 300-302; Miranda, 384 US at 473-474 (“If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.”).

 The majority emphasizes that JDB, 564 US at_; 131 S Ct at 2399, involved a 13-year-old defendant, suggesting that the unique attributes of adolescents recognized by the United States Supreme Court do not apply to 17-year-old minors. Contrary to the majority’s suggestion, the Supreme Court also discussed many of the distinguishing characteristics of adolescents in Roper, 543 US at 556, a case involving a defendant who committed murder when he was 17-years-old. Given the continued vulnerability of older teenagers, it can reasonably be supposed that the *234 protections afforded minors as a result of their unique characteristics apply to 17-year-olds such as defendant.

 Miranda, 384 US at 479.

 The interrogation was recorded on a DVD. Defendant included a transcript of the interrogation in his motion to suppress his statements. Given that the prosecution “[algreed to the transcript” in its response to the motion, I quote defendant’s transcription here, including his use of punctuation.

 In analyzing the exchange, the majority focuses exclusively on the significance of the Ihrais-like reference to the gun’s location and Stiles’s related expression of concern for the safety of others, ignoring the larger context in which this statement occurred. Believing that the only relevant portion of the exchange involves Stiles’s reference to the gun’s location, the majority disputes whether a 17-year-old is more susceptible to an appeal to his or her conscience. But the colloquy must be regarded in its entirety. In its entirety, the appeal to defendant’s conscience was coupled with references to violence and attempts to earn defendant’s trust through expressions of understanding and references to defendant’s family. It was to that entire exchange that the youthful defendant *236 succumbed, not merely the isolated appeal to his conscience through the single question with regard to the location of the gun.