

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-45,746-02

## EX PARTE DAVID WOOD, Applicant

## ON APPLICATION FOR WRIT OF HABEAS CORPUS
## CAUSE NO. 58486-171-2
## IN THE 171ST JUDICIAL DISTRICT COURT
## EL PASO COUNTY

**NEWELL, J., filed a concurring opinion in which KELLER, P.J., HERVEY and KEEL JJ., joined.**

In deciding that intellectually disabled individuals are categorically exempt from the death penalty, the United States Supreme Court effectively held that a clinical determination of intellectual disability lessens the moral culpability of a defendant. In *Atkins v. Virginia*, for example, the Court explained that the only disagreement about the execution of intellectually disabled offenders was determining who is, in

fact, intellectually disabled.[1]  The Court acknowledged that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus."[2]  Later, in *Hall v. Florida*, the Court observed that defining "intellectual disability" is necessary to implement the principles and holding of *Atkins*, including the principle that "[t]he diminished capacity of the intellectually disabled lessens moral culpability."[3]  In short, the Court believes that deficiencies attendant to intellectual disability do not warrant exemption from criminal sanctions; they simply diminish the personal culpability of the intellectually disabled.[4]  But a clinical diagnosis has nothing to do with determining moral culpability.  This case is a prime example of why "clinicians, not judges, should determine clinical standards; and judges, not clinicians, should determine the content of the Eighth Amendment."[5]

---

[1] *Atkins v. Virginia*, 536 U.S. 304, 317 (2002).

[2] *Id.*

[3] *Hall v. Florida*, 572 U.S. 701, 709 (2014).

[4] *Atkins*, 536 U.S. at 318.

[5] *Moore v. Texas*, 137 S. Ct. 1039, 1054 (2017) (Roberts, C.J., dissenting).

**I.**

In *Atkins v. Virginia*, the Court relied upon the "consistency of the direction of change" by state legislatures regarding the execution of intellectually disabled offenders to conclude that the only "serious disagreement" on the issue centered around how to determine whether a capital-murder defendant is intellectually disabled.[6] Then, the Court gave two reasons why intellectually disabled offenders should be categorically excluded from execution. First, the Court explained that executing a defendant who has been clinically diagnosed as intellectually disabled does not further the goal of "retribution" normally used to justify imposing the death penalty.[7] This argument assumes the lessened moral culpability of someone who is intellectually disabled.[8]

The second justification offered by the Court was that executing a defendant diagnosed as a intellectually disabled would not further the goal of "deterrence."[9] The Court gave the following explanation:

---

[6] *Atkins*, at 315-17.

[7] *Id.* at 319.

[8] *Id.* ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the [intellectually disabled] offender surely does not merit that form of retribution.").

[9] *Id.* ("With respect to deterrence—the interest in preventing capital crimes by prospective offenders—'it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation."'").

> Exempting the [intellectually disabled] from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of [intellectually disabled] offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.[10]

The Court also pointed to the danger that intellectually disabled defendants could face wrongful execution. According to the Court, "[Intellectually disabled] defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."[11]

**II.**

But the methodical way in which Applicant, by himself, carried out

---

[10] *Id.* at 319-20 (internal citations omitted). In this regard, the Court appears to have justified its categorical exemption upon the same type of lay perceptions of intellectual disability that should have "spark[ed] skepticism." *See Moore*, 137 S. Ct. at 1051-52.

[11] *Atkins*, 536 U.S. at 320-21.

his crimes paints the exact opposite picture. Applicant raped and murdered six women between September 4, 1987 and March 14, 1988.[12] All of the victims' bodies were found buried in shallow graves in the same desert area northeast of El Paso. They were all approximately 30 to 40 yards from one of the dirt roadways in the desert. Four of the bodies were found in various states of undress, indicating that the killer had sexually abused them. Five of the victims were seen by witnesses on the day of their disappearance accepting a ride from a man with either a red Harley-Davidson motorcycle or a beige pickup truck. Applicant owned two vehicles matching those descriptions. Witnesses identified Applicant as the last person seen with four of the victims. Applicant also kept a burnt orange blanket and some shovels in the back of his pickup truck. Orange fibers found on one of the victim's clothing matched orange fibers taken from a vacuum cleaner bag that Applicant and his then-girlfriend left in their old apartment.

But a seventh victim survived. Judith Kelly, a prostitute and heroin addict, testified that in July 1987 she had been walking outside a convenience store in the northeast part of El Paso when Applicant asked

---

[12] *Wood v. Quarterman*, 503 F.3d 408, 410 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008).

her if she needed a ride. Kelly got in Applicant's truck, but Applicant did not drive her home. Instead, he stopped at an apartment complex and went inside while she stayed in the truck. When he returned, she noticed a piece of rope hanging from one of his pockets. Applicant drove towards the desert, and, after driving around awhile, stopped the truck, got out, and ordered Kelly out as well.

Kelly saw Applicant get a "brownish red" blanket and shovel out of the back of his truck. Applicant then tied Kelly to the front of his truck while he proceeded to dig a hole behind some bushes. This took ten to fifteen minutes. Applicant then returned with the blanket and forced Kelly to the ground, ripping her clothes. However, Applicant stopped when he heard voices. He ordered Kelly back into the truck and drove to a different location in the desert.

Applicant stopped his truck again, ordered Kelly out, spread the blanket on the ground, and forced Kelly to remove her clothes. He then gagged her, tied her to a bush, and raped her. Immediately afterwards, Applicant stated he heard voices again. He threw his belongings back into the truck and drove away. He left Kelly naked in the desert. His last words to her were "[A]lways remember, I'm free."

Applicant told his cellmate, Randy Wells, about the murders.

Applicant described the victims as topless dancers or prostitutes and detailed how he would lure each girl into his pickup truck by offering her drugs. Then, according to Applicant, he would drive out into the desert, tie the victim to his truck, and dig her grave. Then, he would tie her to a tree and rape her. James Carl Sweeney, Jr., another cellmate, testified that Applicant had kept news clippings about the murders. Applicant confessed to Sweeney, Jr., that he had committed those murders.

### III.

And yet, Applicant argues that he is categorically exempt from the death penalty because, under clinical diagnostic criteria, he is intellectually disabled. As the habeas court noted, Applicant's IQ scores range between 64 to 111. The Supreme Court has recently explained that we are not allowed to look at "sources of imprecision in administering the test to a particular individual" to narrow the test-specific standard-error range.[13] The Court made this observation to reject the argument that courts can consider factors "unique" to the test-taker when evaluating multiple IQ tests.[14]

Here, the habeas court relied primarily upon the test administered

---

[13] *Moore*, 137 S. Ct. at 1049.

[14] *Id*.

by Dr. Thomas Allen resulting in an IQ score of 75 because it was the only test that was comprehensive and conducted properly. The habeas court's observations in this regard seem to place weight on the score of 75 not because of factors "unique" to the test-taker, but because the methodology for that test was the most scientifically reliable. But Dr. Allen also questioned whether that test undersold Applicant's actual IQ because of the possibility that Applicant was malingering. This would seem to rely upon the type of factors "unique" to the test-taker that the Supreme Court believes we should not consider. So would placing less weight on the other tests for similar reasons.

With regard to the evidence of adaptive deficits, the habeas court thoroughly details the evidence related to adaptive deficits in the areas of functional academics, communication, self-care, home-living and money management, social and interpersonal skills, use of community resources, self-direction, work, leisure activities, and health and safety. Certainly this evidence shows how Applicant has many adaptive *strengths*. But the Supreme Court, in rejecting our reliance upon the infamous "*Briseno* factors," noted that we are supposed to avoid lay

perceptions and stereotypes regarding intellectual disability.[15]  Further, we are required to focus upon adaptive deficits without placing "undue emphasis" upon adaptive strengths.[16]

Here, the habeas court noted a great amount of evidence showing Applicant's adaptive strengths, but a dearth of evidence demonstrating adaptive deficits.  If we completely ignore the existence of evidence demonstrating adaptive strengths, then this aspect of the inquiry becomes nothing more than a legal choice to credit only mitigation evidence that provides "a basis for a sentence less than death"[17] regardless of the strength of evidence demonstrating a defendant's moral blameworthiness.  It would seem to contradict the Supreme Court's requirement that the definition of intellectual disability be calibrated to only include those whose degree of intellectual disability falls within a national consensus regarding moral blameworthiness.[18]  On the other hand, we cannot rely solely upon the testimony of "a fourth grade

---

[15] *Id.* at 1051-52.

[16] *Id.* at 1052 n.9.

[17] *See Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 607 (1978)) (effectively defining what constitutes mitigating evidence by holding that the Eighth and Fourteenth Amendments require that a jury not be precluded from considering mitigating evidence).

[18] *Atkins*, 536 U.S. at 317.

teacher, a childhood friend, and Applicant's sister"[19] to determine adaptive deficits because that approach is built upon lay stereotypes of the intellectually disabled.[20] Ultimately, *Moore* does not prohibit courts from considering adaptive strengths; it only prohibits placing "undue" emphasis upon them.[21] I do not believe that the habeas court, or this Court, has placed undue emphasis on Applicant's adaptive strengths in this case.

## IV.

In the end, I join this Court's opinion because I do not believe Applicant has proven that the categorical exemption from the death penalty applies to him. The Court rejects Applicant's intellectual disability claim by applying current diagnostic standards. But to the extent that Applicant can build a claim of intellectual disability upon the shifting sands of clinical psychological standards detailed in *Moore*, this case demonstrates that the determination of intellectual disability has become untethered from the original rationale for the exception to the imposition

---

[19] Majority op. at 5.

[20] *Moore*, 137 S. Ct. at 1051-52 (rejecting *Briseno*'s reliance upon lay perceptions of intellectual disability because the medical profession has endeavored to counter lay stereotypes of the intellectually disabled).

[21] *See id.* at 1052 n.9.

of the death penalty announced in *Atkins*. Applicant is not intellectually disabled.  He is a serial killer.

With these thoughts, I join the Court.

Filed: December 12, 2018

Publish