ACCEPTED
01-14-01020-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/11/2015 10:39:25 PM
CHRISTOPHER PRINE
CLERK

## NO. O1-14-01020-CR

## IN THE COURT OF APPEALS FOR THE

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/11/2015 10:39:25 PM
CHRISTOPHER A. PRINE
Clerk

## FIRST DISTRICT OF TEXAS

## AT HOUSTON

-----------------------------------------------------------------

## NO. 991804

## IN THE 185th DISTRICT COURT

## OF HARRIS COUNTY, TEXAS

-----------------------------------------------------------------

**SIMMIE JAMES COLSON III,**            **APPELLANT**

**V.**

**THE STATE OF TEXAS,**            **APPELLEE**

-----------------------------------------------------------------

## BRIEF OF APPELLANT

-----------------------------------------------------------------

**Morris L. Overstreet**            **Winston E. Cochran, Jr.**
Attorney at Law            Attorney at Law
Texas Bar No. 00000046            Texas Bar No. 04457300
P.O. Box 35            P.O. Box 2945
Prairie View, TX 77446            League City, TX 77574
Tel. (512) 844-8357            Tel. (713) 228-2064
E-mail: morrisoverstreet@yahoo.com            E-mail:winstoncochran@comcast.net

Attorneys for Appellant

**ORAL ARGUMENT REQUESTED.**

## STATEMENT REGARDING ORAL ARGUMENT

The appellant requests oral argument because of the novelty and importance of the legal issue presented.

## LIST OF INTERESTED PARTIES

| | |
|---|---|
| Simmie James Colson III | Appellant, Defendant in trial court |
| Morris L. Overstreet<br>P.O. Box 35<br>Prairie View, TX 77446 | Appellant's trial counsel and appellate counsel |
| Winston E. Cochran, Jr.<br>P.O. Box 2945<br>League City, TX 77574 | Appellant's co-counsel on appeal |
| Devon Anderson<br>1201 Franklin, Suite 600<br>Houston, TX 77002 | Harris County District Attorney |
| Sarah Bruchmiller<br>Alan Curry | Assistant District Attorneys |
| Hon. Susan Brown | Judge, 185th District Court<br>Harris County, Texas |

# TABLE OF CONTENTS

Statement Regarding Oral Argument                                        i

List of Interested Parties                                               i

List of Authorities                                                      iii

Statement of the Case                                                    1

Issues Presented                                                         3

Statement of Facts                                                       3

Summary of the Argument                                                  16

Argument and Authorities                                                 16

    A new adjudication hearing should be ordered because the trial
    court judge failed to consider alternative dispositions.

    A.     Standard of Review                                  16

    B.     The Court's Erroneous Belief in Limited Discretion    17

    C.     Harm and Remedy                                     23

Conclusion                                                               25

Certificate of Compliance                                                26

Certificate of Service                                                   26

# LIST OF AUTHORITIES

**Cases**                                                                                                               **Page**

*Clark v. ConocoPhillips Company*, ___ S.W.3d ___ (Tex. App. –
     Houston [14th Dist.], No. 14-14-00034-CV, April 30, 2015)                                         20

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)                                                                      6

*Ex parte Moss*, 446 S.W.3d 786 (Tex. Crim. App. 2014)                                                18

*Garcia v. State*, 387 S.W.3d 20 (Tex. Crim. App. 2012)                                               21

*Garrett v. State*, 377 S.W.3d 697 (Tex. Crim. App. 2012)                                           20

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997)                                               23

*Kotteakos v. United States*, 328 U.S. 750 (1946)                                                       23

*Lockett v. Ohio*, 438 U.S. 586 (1978)                                                                             6

*O'Neal v. McAninch*, 513 U.S. 432 (1995)                                                                   23

*Penry v. Lynaugh*,492 U.S. 302 (1989)                                                                           6

*Taylor v. State*, 2014 WL 2507637 (Tex. App. – Houston [1st Dist.],
     No. 01-11-00052-CR, June 3, 2014)(Unpublished)                                                    21

**Statutes**

28 U.S.C. §2244                                                                                                              20

TEX. CODE CRIM. PROC. Art. 42.12, §5(b)                                                             18, 22

TEX. CODE CRIM. PROC. Art. 42.12, §5(h)                                                             18-19

TEX. CODE CRIM. PROC. Art. 42.12, §9(I)                                                                   22

TEX. CODE CRIM. PROC. Art. 42.12, §21(e)  20

TEX. CODE CRIM. PROC. Art. 42.12, §23(a)  21

TEX. CODE CRIM. PROC. Art. 42.12, §24  21

TEX. PENAL CODE §12.44(a)  18-19

TEX. PENAL CODE §12.44(b)  18-19

TEX. R. APP. PROC. 44.2(b)  22-23

**TO THE HONORABLE COURT OF APPEALS:**

COMES NOW the appellant, Simmie James Colson III (hereinafter "Colson"), through the undersigned counsel, and respectfully requests that this Court reverse the judgment of the 185th District Court of Harris County, Texas and remand this cause to that court for a new adjudication hearing. In support of this motion, the appellant submits the following.

## STATEMENT OF THE CASE

An indictment filed in Cause Number 991804 in the 185th District Court of Harris County accused Colson of theft of property, namely money, with a value over $1500 and less than $20,000, occurring on or about October 14, 2003 (CR-5).[1] Pursuant to a plea agreement, Colson entered a plea of guilty on October 5, 2004, but the district court judge deferred an adjudication of guilt and placed Colson under community supervision (sometimes called "probation," which was the term used for many years) for a period of two years (CR- 12-13, 20-21). Among the conditions of supervision were requirements that Colson report periodically to a supervision officer, that he advise the officer of any address change, that he maintain suitable employment and document that employment, that he perform "community service" hours at a specified pace, that he pay specified fees, and that he pay restitution (CR-

---

[1] The clerk's record is designated "CR" herein. The reporter's record from the adjudication hearing is designated "RR" herein. The original plea proceedings were not recorded by the court reporter.

14-15).

On June 20, 2006 the State filed a motion to adjudicate guilt, alleging that Colson had violated several conditions of his supervision, namely: (1) Colson failed to report in March, April, and May, 2006, (2) Colson failed to prove that he was suitably employed from February to August, 2005 and in January and February of 2006, (3) Colson failed to report an address change, (4) Colson failed to complete community service at a pace of 15 hours per month, (5) Colson failed to pay supervision and laboratory testing fees, (6) Colson failed to pay his fine and court costs, and (7) Colson failed to pay restitution (CR-32). A capias (also referred to as an "arrest warrant" in the testimony) was issued on June 20, 2006, and the Harris County Sheriff's Office received it on that same day, but Colson was not arrested until October 21, 2014 (CR-33).

Colson entered a plea of true to the allegations (CR-41, RR-5). After an evidentiary hearing, the district court judge of the court found that the allegations in the motion to adjudicate guilt were true and assessed punishment at confinement for seven months in the State Jail Division of the Texas Department of Criminal Justice, plus a fine of $600 (CR-41, RR-63). Colson gave timely notice of appeal (CR-44).

## ISSUE PRESENTED

The appeal presents one point of error:

A new adjudication hearing should be ordered because the trial court judge failed to consider alternative dispositions.

## STATEMENT OF FACTS

The record is sparse as to what happened which led to the original indictment. The theft was committed "by check," but who did what with whose check is not clear. All that is certain is that the named victim suffered a specified loss in an amount which made the offense a state jail felony.

Colson's plea of true to the allegations in the motion to adjudicate guilt established that he committed all of the enumerated violations of the condition of his supervision (RR-5). Mitigation evidence then was heard with respect to what disposition was appropriate.

Before delving into that, however, it is worth noting what the evidence does *not* show. The capias (CR-33) shows that the sheriff received it in June, 2006 but did not arrest Colson until October, 2014. There is no evidence that any effort was made to find Colson in that eight-year span. Colson's stipulation at the hearing arguably acknowledged that the community supervision department did not know his whereabouts in June, 2006, but a sheriff, unlike a community supervision officer, has

3

the job of hunting for alleged fugitives. References to Colson as an "absconder" in the hearing evidence and the prosecutor's arguments were misleading.

*Simone Colson.* Colson's daughter, Simone, testified that she was a third-year law student and that she would be "devastated" if Colson were not there to see her graduate (RR-8). That particular problem will disappear by the time this cause is ready for submission, but Simone also offered insights into her father's good qualities, which remain relevant. Simone said she has two brothers and a sister, and her sister works on the staff of the Texas A & M women's basketball team (RR-7). Outside of the family, Simone said, Colson "helps a lot of girls to go to college who otherwise would not be able to go" (RR-8). These were female high school seniors who did not get "national recognition" and "aren't on a lot of schools' radars" but still had talent worthy of basketball scholarships, she explained. For young women who did not come from wealthy families, the connections Colson was able to make for them provided the "only option."

*Marquita Jones.* An example of what Simone was talking about was provided by Marquita Jones, who testified that Colson had helped her daughter apply to various colleges where a basketball scholarship might be available. Apparently Colson's Internet weblog (or "blog") had an audience among collegiate coaches. Ms. Jones' daughter was accepted on a basketball scholarship at Loyola. Without

4

Colson's aid, Ms. Jones believed, the chances of her daughter getting a basketball scholarship would have been "very slim" (RR-13). Colson did charge Ms. Jones' family a fee for his efforts, but the fee was "nothing" in comparison to a $43,000 scholarship that Ms. Jones' daughter obtained (RR-13). The prosecutor's cross-examination of Jones merely re-established that "money changed hands" (RR-16).[2]

On redirect Colson's attorney attempted to elicit Ms. Jones' opinion on a matter which is at the heart of the appellate issue:

*MR. OVERSTREET:* I'll pass the witness.

Excuse me. One last question.

*Q. (BY MR. OVERSTREET)* I explained to you what Mr. Colson is facing if the judge adjudicates him guilty, a minimum of 180 days. What would you say to the judge as to why she should exercise her discretion and do something other than adjudicate him guilty and sentence him to --

*THE COURT:* Please don't have these folks think that I have any discretion at all in this matter.

*MR. OVERSTREET:* Okay.

*THE COURT:* So, I don't want them to leave here today believing the Court has some discretion in this matter, based on the situation and the law.

---

[2] Money changed hands? So what? Money changes hands on Sunday mornings at churches, too, and the prosecutor hopefully would not find it disreputable that some preacher even puts some of that money in his pocket on payday. The prosecutor's questioning misses the point that talent can be used for purely selfish self-advancement, or for only a silk-stocking clientele, or, as in Colson's case, it can be used to help others who really need the help.

(RR- 13-14).  Presumably the judge sincerely believed what she said.  As will be discussed later in this brief, the tangled web of statutory law in this area might easily be misinterpreted by a judge acting in good faith.

*James Daniel*.  The next defense witness, James Daniel, worked for an insurance company and was the coach for the Houston Insiders Girls' AAU [Amateur Athletic Union] basketball program.  Daniel said Colson helped establish that program (RR- 16-17).  The program's goal was to help girls get into college on basketball scholarships (RR-17).  Colson was "one of the key players" in the program "as it relates to networking with the college coaches" (RR-17).  Daniel also noted that Colson had "put his own money" into some of the activities.  Sending Colson to a state jail would adversely affect "girls that currently are in the pipeline" (RR-17).  While that problem also has abated as the critical college application period passed for this year, Colson's ongoing service also speaks to his character in general.

*Diedre Colson*.  Diedre Colson, a paralegal and an ordained minister who is Colson's sister, was the first of several witnesses to speak to the other side of mitigation evidence, namely adversities in Colson's life.[3]  She said Colson had

---

[3]  Mitigating evidence of adversities was explained by the Supreme Court, in the context of death-penalty litigation, in *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989):

> Underlying [*Lockett. v. Ohio*, 438 U.S. 586 (1978) ] and [*Eddings v. Oklahoma,* 455 U.S. 104 (1982) ] is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an

suffered from "a major depressive disorder" which probably stemmed from the combined impact of having his mother die and having his house flood, then becoming homeless after the family's house caught fire (RR-20). The symptoms Diedre noticed included irritability, excessive eating and weight gain, a "lack of social input with people," and forgetfulness. She said it was as if Colson would "just put his head into a dark spot and not deal with life, just deal with those things that he had to, which was mostly his girls, who were still in school" (RR-20). Reaching farther back, Diedre noted that Colson had used drugs earlier in his life (RR-22). She thought Colson's depression was "behind him now," but it had taken its toll. Not trying to sugar-coat the situation, Diedre said Colson and his wife had a "rough marriage" (RR-21). He improved on that situation after one of the family tragedies:

> *Q.* Has anything happened to your mother recently that even highlights more importantly the need for Simmie to be able to care for her?

---

individualized assessment of the appropriateness of the death penalty "evidence about the defendant's background and character is relevant because of the belief, long held by society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 547(1987).

While an adjudication in a theft case may seem a long way from the death penalty, the underlying significance of mitigating evidence is the same: a defendant who has suffered through various afflictions or disadvantages is less blameworthy, from a moral standpoint, than someone who has not faced such adversities. A different form of mitigating evidence is evidence of good character or good deeds. These very different types of mitigating evidence do not contradict each other, for a person capable of good accomplishments may nevertheless be dragged down by adversities.

*A.* Yes. Two years ago my mother was involved -- her house exploded and caught on fire. She coded in the house. She had severe smoke inhalation injuries, as well as carbon monoxide poisoning. She was in a coma for about -- for about three months and it had a very bad impact on me. And he really did step up to take over because I just -- it's something that I could not deal with and I have always been the strongest one but he did step up for me.

*Q.* Okay. And is he involved with your mother now?

*A.* He is now because I -- I work for a hospital and his schedule is more flexible. So, he's really in charge of getting her to her doctors' appointments and taking her to places that she needs to go and just spending time with her. She lives with me but I can't spend the daytime with her. I'm only there at night.

(RR-22). Diedre's opinion was that sentencing Colson to 180 days or more in state jail "would bring the depression back" and adversely affect the family (RR-23). She urged the judge to "consider the positive things that he has done" (RR-23).

On cross-examination the prosecutor extracted an admission that the destructive events occurred "well prior to the events that are occurring now," but Diedre pointed out that there was a "domino effect" as one misfortune compounded another (RR- 24-25). Moreover, events in 2000 or later occurred not long before Colson committed the offense in 2003 and was originally placed under community supervision in 2004. The prosecutor got Diedre to agree that Colson's earlier problems did not affect his compliance with supervision requirements (RR-25), but persons trained in mental illness diagnosis and treatment might well disagree with

8

that. Curing depression is not like getting a ten-minute oil change. Perhaps Colson should have been placed on a mental-health case load back in 2004, which might have avoided the eventual violations.

The prosecutor also asked Diedre why "him facing consequences for his actions" would "have a negative impact" on the family, and Diedre fumbled for an answer (RR-26). The answer, although Diedre could not articulate it on the spur of the moment, is that there is such a thing as family pride. Having to explain that "daddy went to prison" is not painless. Nor is it harmless. There is always someone out there who will think that "the apple doesn't fall far from the tree."

The judge herself asked a much better question, which was when Colson started his project of helping young women obtain basketball scholarships (RR-27). Simone believed it was between 2008 and 2010. That is, as the judge surmised, Colson had "put those things behind him and moved forward" (RR-28). The problem is that "moving forward" may not be enough to meet all expectations and obligations. No road from a deep valley leads straight up.

*Stephanie Colson.* Colson's ex-wife, Stephanie, testified that they had been separated for ten years and finally divorced in 2013 (RR-29). The separation was prompted by Colson's "severe drug and alcohol problem" (RR-29). She also believed Colson suffered from depression (RR-29). His work history was rocky. He worked

for the postal service but was discharged, then attempted to operate a cellular phone business but was not successful (RR-30). She said he was homeless for a period of time when he was abusing drugs, but he fought his way back:

> *Q.* Okay. In your opinion, do you believe Simmie is worth salvaging?
>
> *A.* Oh, of course. I think, actually -- I have several family members who have struggled with drug abuse and alcoholism and Simmie has done very well, considering what he was going through, and he really did it on his own and I give him credit for that. It's just not easy, especially when you have self-doubt and you struggle with depression and you torture yourself, so I think Simmie's done well.

(RR-30).

Nothing was good enough for this prosecutor, who seemed determined to undermine every good thing anyone had to say about Colson. While Stephanie tried to explain the complexity of recovery from depression and drugs, the prosecutor pushed to oversimplify it:

> A. .... [L]ike I say, when people are struggling with addiction, a lot of the demons are within them and I think that just him not being able to deal with a lot of his personal problems just caused him not to be focused. People can exist and they're present but they're totally absent, you know.
>
> *Q.* Okay. So would it be fair to say that the only reason that he did not abide by his probation conditions were because he wasn't focused?
>
> *A.* I can't say and he's never told me why he did not attend. I do know that Simmie was having -- well, we were having financial problems, so, and then, you know, with three kids -- and I really put a lot of attention into them and maybe I wasn't as supportive as I should have been, so I

10

really didn't know a lot, you know.

(RR-33). While cross-examination can, in effect, put words in a witness' mouth, there is a limit to how much of that is fair. That limit was surpassed here, but Stephanie held up against it:

*Q.* And now when you say "personal problems," are you referring to the fact that he wasn't focused?

*A.* Well, I'm not really sure what you mean when you say "not focused" because he wasn't doing well, so he wasn't able to qualify for work.

*Q.* Okay. What do you mean by that?

*A.* Well, I just don't think that he was in a good place mentally.

*Q.* Did he have to seek treatment for that?

*A.* Yes, we did go to counseling, uh-huh, with the church and he has a relative that's a minister.

*Q.* Okay.

*A.* So he did do that.

*Q.* But he didn't have to be placed into any kind of hospital?

*A.* No. And I know that it was recommended that he get on medication but I remember that I didn't want him to do that because I feel that with a drug addiction, prescription drugs would not have been any better. I definitely didn't want that.

*Q.* But you'll agree with me there's plenty of people out there who have mental struggles or mental illness who are able to go out and work and support themselves?

11

*A* Yes, and then there are those that are not.

*Q.* True. Okay.

(RR- 34-35). Score one for the witness.

*David Stephens.* The next witness was David Stephens, the owner of a youth sports events management company (RR-36-37). Colson had covered some of those events to evaluate players who might be able to qualify for college scholarships (RR-37). In a business world where not everyone is a "good guy," Colson fit into that category (RR-37). Stephens knew talent "evaluators" from all over the country and he gave Colson the highest rank for integrity and value of his service (RR-38). Naturally the prosecutor pounced on the word "integrity" and then tried to denigrate Stephens' opinion with the fact that Stephens had not known about Colson being under community supervision, with Colson not having revealed it and Stephens not having conducted a background check (RR-39). As a result, Stephens did not know that there was a felony warrant for Colson's arrest (RR-39). Of course, as will be seen, it is not clear that Colson knew about the warrant either. Try as she might, the prosecutor simply could not bully this witness:

*Q.* Okay. And you weren't aware that there was a felony warrant out for him for not abiding by his felony probation?

*A.* No, I did not.

*Q.* Okay. Now that you know this, does it give you pause dealing with

him, dealing with families who may place their trust in somebody who had a felony warrant outstanding for him for so long?

*A.* Any time anybody has an offense such as this, it would cause me pause. But based upon my experience with Simmie and based on what I've seen him produce, the time lapse since that occurred originally and the fact that I am, on a personal level, a believer in second chances and second opportunities for people who exhibit acceptance of their responsibility and the ability to do what they say, then I would go ahead and still do business with Simmie.

(RR-39-40).

*Simmie Colson.* Colson himself testified to explain why he had not fulfilled the terms of his supervision. Regarding his failure to report to a supervision officer in 2006, Colson said "Things started snowballing in my life." He wrecked his vehicle and did not have convenient transportation. Then the Internal Revenue Service filed a lien on his bank account and he did not even have money for rent. "That's when I went homeless," he explained (RR-44). He was living out of a car and totally embarrassed. His troubles continued to mount as the Attorney General froze his account as soon as the IRS lien was lifted (RR-45). He felt overwhelmed. Because of his depression, he would look in the *Houston Press* for experimental "trial" medications (RR-45). Apparently he did not happen upon the "silver bullet" for depression (and no one else has either). Colson admitted that his "coping skills were not that great" (RR-45).

Colson said he was homeless for over a year, sleeping in a borrowed 1983

Oldsmobile and "trying to do whatever I could to make ends meet" (RR-46). That was in 2005 and 2006, which would make the car twenty years old (RR-52). Probably it did not have that pleasant "new car smell." More importantly, it should be obvious that, night after night, Colson could not have stretched out to sleep on his back, as humans normally do. Many people with depression could benefit from a psychiatrist's skilled care, but Colson even could have benefitted just by getting to lie down on the couch.

Turning to his promotion of student athletes, Colson said he had helped around fifty of them go on to college (RR-47). As to making money, Colson explained that he was not getting rich from this activity:

> Ms. Jones that testified earlier about Kyler, she was asked how much did her husband pay me. Her husband paid me to mail out videos for the kid, you know, for the postage. Some people pay me. Most of these kids that I help one on one, they don't pay me anything. I write my blog, I get over a thousand hits a day, just on a normal day, and up to 3- or 4,000 when I do a big tournament, and I go to the various school districts and cover games. All that's on me. I mean, I'm not getting paid one thing, so every kid I'll write about, college coaches see. I have over a thousand college coaches between Facebook and Twitter that follow me and countless -- I don't even know the number that look at it on the blog.
>
> *Q.* Okay. Now, did you start this because you wanted to make money from it?
>
> *A.* No.

(RR-47).

14

Colson maintained that he should not be incarcerated because he had turned his life around and had become a "giver" rather than a "taker." He had specific responsibilities, such as caring for his mother who had been severely burned and paying child support. Colson admitted that he did not handle the situation right. He did not recall whether he had disclosed all of his problems to his supervision officer (RR-53). In fact, however, he reported for over a year on a two-year supervision period (RR-50). Asked if he would abide by the conditions if his supervision were to be extended, Colson said he would (RR-49).

Colson also pointed out that he at first did not agree with the calculation of fees due, but when he was satisfied that the arrearage figure was correct he promptly paid it (RR-50). Colson did not know there was a warrant for his arrest (RR- 50, 55). How he could have told Mr. Stephens if he did not know about it himself is hard to see.

Colson obviously angered the judge when he referred to his son as "the kid" (RR-51). Despite the *faux pas*, Colson did affirm that he was paying child support. He referred to the child's mother as "the lady that had the child for me," which was a very respectful way to describe the relationship (RR-51).

On cross-examination Colson reiterated that "a lot of things that happened in my life" had a cumulative effect, and depression was "just part of it" (RR-55). He even contemplated suicide at one point (RR-55). The prosecutor pointed out that

15

Colson managed to go to basketball games after he "pulled himself together" but he failed to contact his supervision officer. True enough, but a person afflicted with depression might seek out something which was emotionally uplifting while avoiding something he dreaded. Even healthy people do some of that.

## SUMMARY OF THE ARGUMENT

The district court judge stated early in the hearing that she did not have any discretion to take a step other than sending Colson to a state jail upon finding the allegations of supervision violations to be true. That is not correct. The district court judge had discretion to either convict or punish Colson for a Class A misdemeanor. The judge also had discretion to continue Colson on supervision for a short time, either by maintaining the deferred-adjudication supervision or convicting Colson and placing him under a regular supervision following conviction. The district court judge failed to consider those possible alternatives and should be given an opportunity to do so.

## ARGUMENT AND AUTHORITIES

**A new adjudication hearing should be ordered because the trial court judge failed to consider alternative dispositions.**

### A. Standard of Review

Normally a decision as the disposition of a community supervision issue would seem to be the quintessential discretionary decision, reversible only for an abuse of

discretion. In this instance, however, the district court judge was proceeding from an erroneous legal assumption as to the options available. The underlying question is thus a question of law, which is reviewable *de novo*.

## B. The Court's Erroneous Belief in Limited Discretion

During the testimony of Marquita Jones, the judge stated on the record that she did not believe that she had any discretion to take any action other than sentencing Colson to at least 180 days of confinement in a state jail (RR- 13-14). That is not correct, although the statutory framework is so murky that it is easy to see why the judge was confused.

Confusion seems to have stemmed from the fact that, due to the much-delayed arrest of Colson, the judge was up against a ten-year maximum limit on the total duration of community supervision. In TEX. CODE CRIM. PROC. Art. 42.12, §22(c), which refers to "community supervision" without distinguishing between deferred adjudication and supervision following an actual felony conviction, the statute provides in part that "the period of community supervision in a first, second, or third degree felony case may not exceed 10 years ..." The law applicable to the higher grades of felonies in this respect also applies to state jail felonies. *Garrett v. State*, 377 S.W.3d 697 (Tex. Crim. App. 2012). When defense counsel pointed out *Garrett*, the judge was concerned that *Garrett* only applied if the possible supervision

17

period had not expired (RR- 59-60). As defense counsel observed, however, that begs the question of whether supervision had expired (RR-60).

If only the calendar mattered, the ten-year period would have elapsed on October 5, 2014. If that were the situation, Colson would not have even been subject to supervision when he was arrested, let alone when his guilt was adjudicated, and the district court would have lacked jurisdiction to convict him. There is, however, what amounts to a tolling provision in the law. Under TEX. CODE CRIM. PROC. Art. 42.12, §§5(b) and 5(h), the district court retained jurisdiction to conduct an adjudication hearing if the State had filed a motion requesting that the court "proceed with the adjudication" and a capias had issued for Colson's arrest before the supervision period has expired. *See Ex parte Moss*, 446 S.W.3d 786, 791 (Tex. Crim. App. 2014). That occurred in this cause. As of the hearing on December 11, 2014, the district court had jurisdiction. The question then becomes what the judge could do under that jurisdiction.

Even assuming *arguendo* that the judge could not extend the deferred-adjudication supervision beyond October 5, 2014, the judge did have the authority to consider alternatives to a state jail felony conviction and punishment. Since the judge had not yet acted upon the plea entered back in 2004, it was within the judge's power to find Colson guilty of a Class A misdemeanor or, upon finding him guilty of a state

18

jail felony, to punish him as if the offense were only a Class A misdemeanor. *See* TEX. PENAL CODE §§12.44(a) and 12.44(b). The latter applies because, even ten years later, Colson had not yet been declared guilty of a state jail felony. The former applies because TEX. CODE CRIM. ROC. Art. 42.12, §5(b) provides in part:

> After an adjudication of guilt, all proceedings, including assessment of punishment, pronouncement of sentence, granting of community supervision, and defendant's appeal continue as if the adjudication of guilt had not been deferred.

Undeniably the "assessment of punishment" in a state jail felony case may include, in a judge's discretion, resort to Section 12.44(a). Technically Section 12.44(b) is not a "punishment" decision, although its language implies that it may be used whenever Section 12.44(a) may be used. In light of the mitigating evidence in this cause, a reasonable judge could have entertained resort to either Section 12.44(a) or Section 12.44(b) if the judge had believed that either one was a possible alternative. Apparently the judge in this cause did not believe those alternatives were available, when in fact they were.

Three other alternatives were available. They share the common premise that, as of December 11, 2014, the supervision period had not expired, so it is worth exploring that question first. The most logical reading of TEX. CODE CRIM. PROC. Art. 42.12, §§5(h) is that supervision does not expire while proceedings in a court are in progress. It would be ridiculous to think that the district court could "proceed with

19

an adjudication of guilt" but was powerless to consider the alternatives. For one thing, the power to "proceed with an adjudication of guilt" implies that a judge retains the power to *not* proceed with the adjudication of guilt, *i.e.* with the pronouncement of guilt. The net effect would be to put Colson back under deferred-adjudication supervision for some period of time.

What would that period of time be? The best reading of Section 5(h), and of its counterpart provision in TEX. CODE CRIM. PROC. Art. 42.12, §21(e), is that the filing of the State's motion and issuance of a capias, taken together, implement a "tolling" provision, which in effect "stops the clock" on the running of the deadline. Under a tolling provision, the amount of time remaining before the supervision expiration deadline would define a new duration for supervision once it commenced. One example of that policy is the tolling provision built into federal habeas review. *See* 28 U.S.C. §2244. This Court probably can think of many examples in civil case law, such as the recent decision in *Clark v. ConocoPhillips Company*, ___ S.W.3d ___ (Tex. App. – Houston [14th Dist.], No. 14-14-00034-CV, April 30, 2015). Any other approach would produce the absurd result that, although a district court could conduct a belated hearing by virtue of tolling, it could not do anything but conduct the hearing. Surely that is not what the Legislature intended.

What time would be remaining? Assuming that the two-year period was tolled

20

on June 20, 2006, the remaining duration until October 5, 2006 was 77 days. Since the Legislature no longer recognizes an across-the-board "due diligence" requirement, as was explained in *Garcia v. State*, 387 S.W.3d 20 (Tex. Crim. App. 2012) and *Taylor v. State*, 2015 WL 2507637 (Tex. App. – Houston [1st Dist.], No. 01-11-00052-CR, June 3, 2014), the tolling period continued until Colson was arrested on October 20, 2014.[4] The court then had continuing supervision jurisdiction until January 15, 2015. Before that time, however, this appeal effectively stayed the running of the time after December 11, 2014. As *Clark* illustrates, appellate steps can extend even a relatively short remaining period for action for months or years.

This leads back to the three other alternatives. First, the judge could simply do nothing and continue Colson on deferred adjudication supervision. Under this approach there would be no "revocation" (or more precisely, adjudication), so TEX. CODE CRIM. PROC. Art. 42.12, §23(a) would not apply. That section may have been the main source of the judge's belief that she could not assess a term less than the minimum prescribed for a state jail felony, *i.e.* 180 days. Of course this is

---

[4] The State was far from diligent in executing the resulting arrest warrant, but the statutory defense based on a lack of due diligence, set forth in TEX. CODE CRIM. PROC. Art. 42.12, §24, is only applicable to adjudications based on certain grounds, and Colson admitted that he had violations based on additional grounds. Colson notes that, since a broader due diligence requirement had been recognized at an earlier time, the statutory restriction to certain types of violations arguably could be read as not completely repealing the earlier case law with a broad sweep. That is a matter to debate in the Court of Criminal Appeals, given existing case law, and it should not be necessary to engage in that debate in order to grant Colson relief.

assuming that "revocation" under Section 23(a) includes an adjudication, which is not clear from the statute. If such is not the case, then the minimum term under that provision did not apply anyway.

Second, it would have been possible to convert a deferred-adjudication supervision to a regular supervision, the difference being that Colson would have a felony conviction. The "granting of community supervision" is explicitly included as one of the alternatives which a court, acting as if there had been no deferred adjudication, proceeds to adjudication under Section 5(b).

Third, either of those methods of continuing Colson's community supervision could have been reinforced by ordering a mental-health evaluation, either as a new condition of a deferred-adjudication supervision or using a presentence investigation as a vehicle, pursuant to TEX. CODE CRIM. PROC. Art. 42.12, §9(i), for a supervision following conviction.

The State's likely counter-argument, of course, would be that a few more weeks of supervision would not be of much help. That assumes, however, that a few weeks of supervision would be inadequate to build a foundation for Colson to help himself in the future. Sure, more time for the constructive effects of supervision would be beneficial, especially with a mental health evaluation in the mix. The State is in a poor position to complain of a short period of time, however, considering that

22

the capias apparently sat in some file cabinet in the sheriff's office for years. Furthermore, a proper precedent can be established in this cause for future cases where more time would be available. The benefit of that goes far beyond this cause.

## C. Harm and Remedy

Since the error arises from failing to consider alternatives provided by statutes, the harm standard is that of TEX. R. APP. PROC. 44.2(b), applicable to error which is not constitutional error. Under that rule, error "that does not affect substantial rights must be disregarded." This language has been interpreted by Supreme Court case law. *Kotteakos v. United States*, 328 U.S. 750 (1946), cited in *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997), held that "a substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos* went on to explain that harm exists if the reviewing court "cannot say, with fair assurance," that harm was absent. *Kotteakos,* 328 U.S. at 765. "Grave doubt" on the question calls for reversal. *Id.* "Grave doubt" was defined in *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995), as meaning "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipose as to the harmlessness of the error." On the record in this cause, there is not "fair assurance" that harm was absent.

The judge made it clear that, as she read the applicable law, she did not have

23

any available alternatives to a state jail sentence. Possible alternatives which did exist were not even considered. It is entirely possible that, with the guidance which this Court can provide regarding alternatives, the district court judge would resort to one of those alternatives. Certainly there was ample mitigating evidence – showing both Colson's good qualities and his misfortunes – to support some leniency. At the very least, the process would be more complete and fair.

## CONCLUSION

Wherefore the appellant prays that the judgment of the district court be reversed and that this cause be remanded to the district court for a new hearing and new decision on the State's motion to adjudicate guilt.

Respectfully submitted,

/s/ Morris L. Overstreet
Morris L. Overstreet
Attorney at Law
Texas Bar No. 00000046
P.O. Box 35
Prairie View, TX 77446
Tel. (512) 844-8357
E-mail: morrisoverstreet@yahoo.com

/s/ Winston E. Cochran, Jr.
Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
E-mail: winstoncochran@comcast.net

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief was prepared in WordPerfect, using 14-point font for text and 12-point font for footnotes, and that, excluding those portions not counted under TEX. R. APP. PROC. 9, the brief contains 5729 words.

/s/ Winston E. Cochran, Jr.
Winston E. Cochran, Jr.

## CERTIFICATE OF SERVICE

I certify that a copy of this motion is being served on counsel for the appellee, by mail or personal delivery, at the following address on the 11th day of May, 2015:

Harris County District Attorney's Office
Appellate Division
1201 Franklin, Suite 600
Houston, TX 77002