NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 16-1044

STATE OF LOUISIANA

VERSUS

AUSTIN BENJAMIN CEDARS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 5484-13
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

BILLY HOWARD EZELL
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Van H. Kyzar, Judges.

Cooks, J., dissents and assigns reasons.

AFFIRMED.

**John Foster DeRosier**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR:**
     **State of Louisiana**

**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT:**
     **Austin Benjamin Cedars**

**EZELL, Judge.**

Austin Benjamin Cedars (Defendant) appeals the judgment of the trial court sentencing him to thirty years of hard labor. For the following reasons, we affirm the decision of the trial court.

## FACTS

On January 24, 2013, Defendant was charged by bill of indictment with the second degree murder of Anthony Batiste in violation of La.R.S. 14:30.1. On May 28, 2015, the State amended the bill to charge Defendant with manslaughter in violation of La.R.S. 14:31(A)(1). At that time, Defendant pled guilty to the amended charge and a presentence investigation was ordered.

The State provided the following factual basis for Defendant's guilty plea:

> Your Honor, the State would prove at trial that the [D]efendant and the victim, as well as other people, who lived at the residence at 3214 Louisiana Avenue, that there had been some arguments throughout the day and at one point the victim, Anthony Batiste, on December 2nd of 2012, entered the residence. At that time the [D]efendant was armed with a .22 handgun and shot him multiple times causing his death.

Testimony from Defendant's sentencing hearing and the hearing on the motion to reconsider sentence indicate the victim had a physical altercation with Defendant's mother and girlfriend during the morning and that he returned high on drugs and angry in the afternoon. The victim then got into an altercation with Defendant's co-defendant Keenan Cedars, who shot the victim in the buttocks, at which point Defendant entered the room and shot the victim six times, including one to the face, "just about at point blank range." On August 21, 2015, Defendant was sentenced to serve thirty years at hard labor. Defense counsel entered an unspecified objection to the sentence at that time.

On September 10, 2015, Defendant filed a "Motion to Reconsider Sentence" alleging that: "[t]he subject sentence is almost the maximum sentence that can be imposed [for] the crime to which Defendant pled. Accordingly, this sentence is excessive and/or cruel punishment." On December 11, 2015, the trial court held a hearing on Defendant's motion to reconsider, at which time defense counsel argued the trial court should strongly consider factors twenty-four through thirty under La.Code Crim.P. art. 894.1(B). These factors concern provocation, justification, and inducement of Defendant's conduct, as well as prior criminal history, or lack thereof, the likelihood the circumstances would recur, and Defendant's likelihood of responding affirmatively to probation. The trial court denied the motion, noting it originally struggled with determining an appropriate sentence given Defendant's youth and the facts surrounding the confrontation which led to the victim's death at Defendant's hand. From that decision, the Defendant appeals.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant claims that his sentence is excessive because he was only seventeen years old at the time of the offense and he believed he was protecting his family from domestic violence. He in no way challenges the plea itself or his ability to enter into it, and he in no way claims the plea was not entered freely or knowingly. The only issue before this court is a claim of excessive sentence.

2

Defendant pled guilty to manslaughter in violation of La.R.S. 14:31, which provides that "[w]hoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." La.R.S. 14:31(B). Accordingly, Defendant's thirty-year sentence represents 75% of the maximum and is at the higher end of the sentencing range.

Louisiana Code of Criminal Procedure Article 881.1 provides the mechanism for preserving the review of a sentence on appeal:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as

3

excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261 (alteration in orginal).

Initially, we note Defendant's motion to reconsider did not actually raise any issues other than the fact Defendant's sentence is "almost the maximum." During the hearing on Defendant's motion, however, defense counsel did expound on why he believed Defendant's sentence was excessive, discussing the La.Code Crim.P. art. 894.1(B) factors mentioned above, as well as repeatedly alluding to Defendant's essentially parentless upbringing and his early and constant exposure to drug abuse.

4

The State counters that Defendant's claims that he was too young to be truly culpable should not be considered on appeal. The State claims this court should not consider this claim under Uniform Rules—Courts of Appeal, Rule 1-3, which requires issues be presented to the trial court before this court will consider them. However, as defense counsel argued Defendant's upbringing, youth, and the failure of his parents to provide any sort of stability or direction, we find Defendant sufficiently raised the issue of his youth so as to be properly before this court.

Defendant cites *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011 (2010), and *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455 (2012), to argue that the trial court "failed to fashion a sentence in the lower range of sentences which would account for these mitigating factors." This is despite the fact that Defendant admitted the trial court stated it considered Defendant's youth and family history. Defendant feels his thirty-year sentence is excessive, arguing that he "lacked the judgment of an adult." He claims he acted impulsively and without consideration of the consequences. He further asserts that he simply wanted to protect his loved ones and his home but sadly took things too far.

While Defendant's youth is a mitigating factor to be properly considered by this court, both *Graham* and *Miller* are inapplicable to the instant case. Both cases focused on the inappropriateness of giving a juvenile a life sentence without parole eligibility. Defendant here did not receive a life sentence, and moreover, his plea to manslaughter lowered his sentencing exposure from life imprisonment to a maximum of forty years.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *writ* denied, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three-factor test from *State v.*

5

*Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. *Lisotta* established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

With respect to the nature of the offense, while Defendant pled guilty to manslaughter, he was originally charged with second degree murder. Defendant shot Mr. Batiste six times after he had already been shot in the buttocks by Keenan Cedars, including once at extremely close range. Defendant claims he was protecting his family; however, the trial court noted the proximity of one shot could have provided intent to kill, even if the other five shots lacked said intent.

The second *Lisotta* factor, Defendant's nature and background, is where the crux of Defendant's argument lies. Defendant was a seventeen-year-old at the time of the shooting with two arrests for possession of marijuana but no prior felony convictions. The trial court acknowledged Defendant's difficult upbringing, which has already been described, noting it was considered as a mitigating factor pursuant to La.Code Crim.P. art. 894.1. Defendant appears to be arguing that simply because he is young, he should get a sentence on the lower end of the sentencing range for his crime. This court has previously answered that claim in *State v. Miller*, 12-1401, p. 8 (La.App. 3 Cir. 6/5/13), 114 So.3d 670, 676: "Although this court has recognized a defendant's youth as a mitigating factor, we have found no cases where this court found that youth alone justifies the imposition of a lesser sentence." The trial court explicitly considered Defendant's youth in shaping his sentence. Moreover, Defendant was not a mere seventeen years old when he pled guilty. Rather, he was twenty years old at the time he agreed to his plea, and he had already violated his bond agreement while awaiting trial.

6

The final *Lisotta* factor, sentences imposed in similar crimes, suggests Defendant's sentence is not excessive. "Louisiana jurisprudence reveals that mid-to-high range sentences have been upheld in other manslaughter cases." *State v. Sepulvado*, 10-435, p. 27 (La.App. 3 Cir. 3/9/11), 59 So.3d 463, 479, *writ denied*, 11-1151 (La. 11/14/11), 75 So.3d 941. In *State v. Lewis*, 09-1404 (La. 10/22/10), 48 So.3d 1073, the supreme court reinstated a thirty-year sentence for manslaughter where the defendant had picked up a gun while watching two friends fight and shot one of the combatants in the head, killing him. The supreme court noted that the fifth circuit's decision to vacate the thirty-year sentence as excessive contradicted its finding that the evidence could have supported a second degree murder charge.

Likewise, the trial court in the case here noted Defendant could easily have been facing a second degree murder conviction, stating:

> I mean, you know, I can see where a jury would, you know, see that he made that choice because you can make the choice in an instance [sic] to inflict death or great bodily harm or, you know, at point blank range, you know, fired that final and fatal shot and so I mean potentially he could've gotten -- you know, he could've had a more serious -- he could've had a second degree murder conviction . . . .

Similarly, the fifth circuit in *State v. Weatherspoon*, 06-539 (La.App. 5 Cir. 12/12/06), 948 So.2d 215, *writ denied*, 07-462 (La. 10/12/07), 965 So.2d 398, upheld a thirty-five year sentence for a sixteen-year-old defendant who fired a gun into a crowd, killing a fourteen-year-old boy, after the car the defendant was riding in was hit with a bottle. The court upheld his sentence despite the defendant's youth and alleged diminished mental ability.

The trial court here admittedly struggled with determining a fitting sentence given Defendant's youth and the facts surrounding the altercation. However, the

7

trial court clearly considered numerous factors in the formation of Defendant's sentence, including his youth and poor upbringing, and balanced those factors against the violent nature of the offense and Defendant's reduced sentencing exposure under a manslaughter plea. The relevant question before this court is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996). Based on the cases cited above, we cannot find that the trial court abused its discretion in sentencing Defendant to thirty years at hard labor for shooting an already-wounded man six times, especially where at least one of Defendant's shots, fired at near-point-blank range, after any threat had been neutralized, clearly showed intent to kill.

For the above reasons, Defendant's conviction and sentence are hereby affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal, Rule 2–16.3.

# FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 16-1044

STATE OF LOUISIANA

VERSUS

AUSTIN BENJAMIN CEDARS

Judgment rendered and mailed to all parties or counsel on July 19, 2017. Applications for rehearing may be filed within the delays allowed by La. Code Civ. P. art. 2166 or La. Code Crim. P. art. 922.

**Cooks, J., dissents.**

In *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012) the United States Supreme Court went to great lengths to explain its rationale for holding that a mandatory life sentence without parole imposed on persons under the age of 18 at the time of their crime(s) violates the Eighth Amendment to the United States Constitution prohibiting cruel and unusual punishments. The majority finds *Miller* inapplicable because Defendant did not receive a life sentence. I believe this misapprehends the rationale in *Miller* and ignores the Supreme Court's clear message regarding the sentencing of juvenile offenders like Benjamin Cedars. **Although *Miller* dealt with mandatory life sentences, the court emphasized that its rationale <u>concerning juveniles generally</u> is not "crime specific:"**

> The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper*, 543 U.S., at 560, 125 S.Ct. 1183. That right, we have explained, "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' " to both the offender and the offense. *Ibid.* (quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). As we noted the last time we considered life-without-parole sentences **imposed on juveniles, "[t]he concept of proportionality is central to the Eighth Amendment."** *Graham*, 560 U.S., at 59, 130 S.Ct., at 2021. **And we view that concept less through a historical prism than according**

to " 'the evolving standards of decency that mark the progress of a maturing society.' " *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)).

*Miller v. Alabama,* 132 S.Ct. (2012) (emphasis added).

The high court reasoned that juveniles are less culpable than adults by reason of their age and inexperience for purposes of sentencing them for serious criminal offenses. The court did not limit its rationale to life sentences only. The United States Supreme Court began its analysis with an examination of the rationale discussed in *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, (2005) and *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011 (2010):

> To start with the first set of cases: *Roper* and *Graham* establish that **children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments."** *Graham,* 560 U.S., at 68, 130 S.Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper,* 543 U.S., at 569, 125 S.Ct. 1183. Second, **children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings.** *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570, 125 S.Ct. 1183.
>
> Our decisions rested not only on common sense—on what "any parent knows"—but on science and social science as well. *Id.,* at 569, 125 S.Ct. 1183. In *Roper,* we cited studies showing that " '[o]nly a relatively small proportion of adolescents' " who engage in illegal activity " 'develop entrenched patterns of problem behavior.' " *Id.,* at 570, 125 S.Ct. 1183 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham,* we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." 560 U.S., at 68, 130

S.Ct., at 2026. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his " 'deficiencies will be reformed.' " *Ibid. (quoting* Roper, *543 U.S., at 570, 125 S.Ct. 1183)*

**Roper** and **Graham** emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because " '[t]he heart of the retribution rationale' " relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " *Graham,* 560 U.S., at 71, 130 S.Ct., at 2028 (quoting *Tison v. Arizona,* 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Roper,* 543 U.S., at 571, 125 S.Ct. 1183). Nor can deterrence do the work in this context, because " 'the same characteristics that render juveniles less culpable than adults' "—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. *Graham,* 560 U.S., at 72, 130 S.Ct., at 2028 (quoting *Roper,* 543 U.S., at 571, 125 S.Ct. 1183). Similarly, incapacitation could not support the life-without-parole sentence in *Graham* : Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but " 'incorrigibility is inconsistent with youth.' " 560 U.S., at 72–73, 130 S.Ct., at 2029 (quoting *Workman v. Commonwealth,* 429 S.W.2d 374, 378 (Ky.App.1968)). And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." *Graham,* 560 U.S., at 74, 130 S.Ct., at 2030. **It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change.** *Ibid.*

*Graham* concluded from this analysis that life-without-parole sentences, like capital punishment, may violate the Eighth Amendment when imposed on children. To be sure, *Graham*'s flat ban on life without parole applied only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm. See *id.,* at 69, 130 S.Ct., at 2027. **But none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.** Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.

Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without

the possibility of parole. In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. Cf. *id.,* at 71–74, 130 S.Ct., at 2028–2032 (generally doubting the penological justifications for imposing life without parole on juveniles). **"An offender's age," we made clear in *Graham*, "is relevant to the Eighth Amendment,"** and so "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.,* at 76, 130 S.Ct., at 2031. The Chief Justice, concurring in the judgment, made a similar point. Although rejecting a categorical bar on life-without-parole sentences for juveniles, he acknowledged "*Roper*'s conclusion that juveniles are typically less culpable than adults," and accordingly wrote that "**an offender's juvenile status can play a central role" in considering a sentence's proportionality.** *Id.,* at 90, 130 S.Ct., at 2039; see *id.,* at 96, 130 S.Ct., at 2042 (Graham's "youth is one factor, among others, that should be considered in deciding whether his punishment was unconstitutionally excessive").

*Miller,* 132 S.Ct. 2464–66 (footnotes omitted) (emphasis added).

These factors, which should be considered in sentencing juveniles, are especially applicable here to this youthful Defendant. His mother candidly testified in the sentencing hearing that he was raised in an environment in which he had no father. His mother admitted she was a frequent drug user who engaged in sexual encounters with many men in their home. Defendant had no way out of the environment; and yet, to his credit, he had a job and was not a drug addict. There is mention of some minor trouble with marijuana on his part but *he was nothing more than a casual puffer.* The judge focused on the mother's lifestyle and concluded that Defendant was emulating that life because he already had a live-in girlfriend and had one run-in with marijuana use. The sins of the mother should not be an additional cross this Defendant must bear. Though the majority and the trial judge acknowledge Defendant's youthfulness they both, nevertheless, seem to miss the point enunciated in *Miller, Graham* and *Roper*. This is especially so in

4

regards to considering Defendant's culpability for his actions. The judge found Defendant shot the victim after he had already been shot by Keenan Cedars (Keenan) with a shotgun. Further, he found Defendant not only shot the victim multiple times, but inflicted one final, fatal shot to the head. This, says the judge, motivated him to impose a far lengthier sentence on Defendant than if these so-called facts were not so. The majority relies on this same misconstruction of the facts to conclude the trial judge did not abuse his discretion in imposing sentence on Defendant. A review of the record in these proceedings shows the trial judge, and the majority, are mistaken—the facts in evidence do not support this version of what actually occurred in this case. Their basis for imposition of such a severe sentence on this first-time, youthful offender **simply does not exist**.

This Defendant was a seventeen-year-old boy of slight physical build whom one witnesses at the scene described as "a little boy." Despite having been raised by a drug-addicted mother, who engaged in frequent sexual encounters with many partners, this Defendant still cared for that mother and immediately came to her rescue when summoned after she was physically beaten and their residence "trashed" by Anthony. Defendant's youthful age and particular circumstances weigh heavily in the process of determining an appropriate sentence. Additionally, this Defendant's youthful age and the attendant incapacities of young age, put Defendant at a "significant disadvantage in [this] criminal proceeding." *Miller*, 132 S.Ct. at 2468. I have great difficulty reconciling the fact **that Defendant's uncle, Keenan, who shot Anthony with a shotgun at close range, pled guilty to manslaughter in this case and received an <u>eighteen-year sentence, suspended,</u> while Defendant pled guilty to manslaughter and received a <u>thirty-year sentence</u> at hard labor <u>without benefit of parole or probation.</u>** According to

the coroner's report the wound inflicted by Keenan, as well as one of the wounds inflicted by Defendant, *together resulted in Anthony's death*. Moreover, I am disturbed by the fact that Keenan says *he and Anthony had both been doing drugs for days* before this occurrence, yet it is Defendant's infrequent use of marijuana in the past which seems to play a significant role in the majority and the trial court's harsh treatment of him. As the court said in *Miller*, 132 S.Ct. at 2467:

> As we observed, "youth is more than a chronological fact." *Eddings,* 455 U.S., at 115, 102 S.Ct. 869. **It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness."** *Johnson,* **509 U.S., at 368, 113 S.Ct. 2658. It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage."** *Eddings,* 455 U.S., at 115, 102 S.Ct. 869. And its "signature qualities" are all "transient." *Johnson,* 509 U.S., at 368, 113 S.Ct. 2658. *Eddings* is especially on point. There, a 16–year–old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance. We found that evidence "particularly relevant"—more so than it would have been in the case of an adult offender. 455 U.S., at 115, 102 S.Ct. 869. We held: **"[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered"** in assessing his culpability. *Id.,* at 116, 102 S.Ct. 869.

I am also bothered by the majority's conclusion that we are barred from reviewing the sufficiency of the evidence to support Defendant's guilty plea. *See State v. Raymo*, 419 So.2d 858 (La. 1982). I recognize this court has held that "[g]enerally, a defendant waives the right to question the merits of the State's case or the underlying factual basis by entering a plea of guilt . . ." *State v. Johnson*, 04-1266 p. 6 (La.App. 3 Cir. 2/2/05), 893 So.2d 945, 950. But, this court has also held that:

> [When] the accused protests his innocence or for some other reason the trial court is put on notice that there is a need for such an inquiry, [then] **due process requires a judicial finding of a**

6

**significant factual basis of the defendant's plea**. *State v. Linear*, 600 So.2d 113, 115 (La.App. 2 Cir. 1992); *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed. 2d (1970)

*Id.* (emphasis added)

As we noted in *Johnson*, the Louisiana State Supreme Court explained in *State v. Oman*, 97-2089, pp. 1-2 (La. 1/9/98), 704 So.2d 245, 245 (citations omitted) (relying on the rationale in *Alford*) that:

> [T]he standard under *Alford* is not whether the state may prevail at trial by establishing the essential elements of the crime beyond a reasonable doubt and negating all possible defenses, but rather *whether the strength of the factual basis, coupled with the other circumstances of the plea, reflect that the plea "represents a voluntary and intelligent choice among the alternative[s]."*

*Johnson*, 893 So.2d at 951.

Here, not only does the record reflect Defendant did protest his innocence,[1] there is also other compelling reason which put the trial court on notice that "there is need for such inquiry." *Johnson*, 893 So.2d at 950. **This Defendant's youthful age at the time of the offense**, and at the time he entered his guilty plea, made it all the more imperative that the trial court require the State to set forth more thorough facts to establish a basis for Defendant's guilty plea in circumstances such as this in order for him to make "*a voluntary and intelligent choice among the alternative[s].*" *Oman*, 704 So.2d at 245 (emphasis added). Having reviewed the entire record, I believe, in addition, the factual recitation in the record is insufficient to form a basis for a guilty plea of manslaughter.

> To support manslaughter, the state must prove the defendant committed a homicide which would be murder under either La.R.S.

---

[1] The record reflects statements by Defendant and other witnesses which clearly raise the issue of self-defense/justifiable homicide under Louisiana's stand-your-ground law. Additionally, Defendant directly raised the issue of self-defense in the hearing on the motion to reconsider sentence.

7

14:30 or La.R.S. 14:30.1, but the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation will not reduce a homicide to manslaughter if the offender's blood had actually cooled, or any average person's blood would have cooled, at the time the offense was committed. La.R.S. 14:31.

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20[A(1)].

*State v. Allen*, 463 So.2d 680, 681 (La. App. 4th Cir. 1985).

The majority recites, and relies on, **the scant facts which formed the basis for Defendant's guilty plea**, to wit:

Your Honor, the State would prove at trial that the defendant and the victim, as well as other people, who lived at the residence at 3214 Louisiana Avenue, that there had been some arguments throughout the day and at one point the victim, Anthony Batiste, on December 2nd of 2012, entered the residence. At that time the defendant was armed with a .22 handgun and shot him multiple times causing his death.

This statement formed the sole basis for Defendant's guilty plea to a charge of manslaughter. The State offered no other basis for the charges against Defendant. The statement implies Anthony lived at the residence, *but the record shows this is not true.* In fact, the witnesses' statements, including Anthony's sister-in-law Shawntell Guillory (Shawntell), indicate *he was told not to return to the residence* after assaulting Defendant's mother and girlfriend. Anthony briefly dated Defendant's mother, but nothing establishes he was residing at this residence. According to Defendant, he resided at this residence with his girlfriend, mother, and his two sisters.

*The record also shows that Anthony forced his way into the residence.* Anthony arrived at the residence under the influence of methamphetamines and

8

other drugs, acting belligerent, and attempting to forcibly enter the residence to remove items he said belonged to him. The majority acknowledges as much. Upon hearing Anthony carrying on outside the residence *Defendant ran to the front door and locked it* to keep Anthony from entering the residence. Undaunted, Anthony entered through another door, and immediately attacked Defendant's uncle, Keenan, and then turned to attack Defendant when he tried to help his uncle. Shawntell stated when Anthony tried to enter through the front door Defendant slammed it shut and locked it, corroborating Defendant's statement to that effect. She says Anthony then went down the side of the house, banging on the walls and shouting to be let inside the residence. She stated that someone opened the back door. Keenan says that as soon as he opened the back door Anthony shoved him and punched him in the face. Anthony enjoyed no right to force his way through Defendant's residence. Additionally, *contrary to the recited "facts," nothing in the record establishes that "there had been some arguments throughout the day" between Defendant and Anthony, only between Defendant's mother and Anthony.*

The guilty-plea recitation of facts also suggest that the shots fired from Defendant's .22 caliber pistol was the sole cause of Anthony's death, but, I repeat, the coroner's report does not support that conclusion, and no other evidence of record speaks to this statement. According to the coroner's report, the shotgun blast fired by Keenan, and one bullet, fired by Defendant, in the left, mid-back, caused what the coroner refers to as the most "remarkable injuries." *The autopsy report indicates the shotgun blast resulted in severe, life-threatening injuries to the victim as did the bullet wound to the mid-back.* The record does not contain any basis to conclude that any of the shots fired by Defendant were the sole "cause" of death. The coroner lists the cause of death as "multiple gunshot and shotgun

9

wounds of the head and trunk." But, the only "head" wound inflicted by Defendant, or anyone, is the wound in Anthony's left cheek, which, according to the coroner's report, resulted only in "soft tissue" injury to his face. Thus, the coroner's conclusion that the deceased died as a result of multiple gunshot wounds to the "head and trunk" is misleading in that in his own autopsy report the coroner observed only one wound in the head area, and, he says, it only resulted in soft tissue injury. Thus, I say again, there is no basis in the record to conclude which wound(s) were fatal, and *more importantly, no basis to conclude that the only wound inflicted in the "head" was a final, fatal wound*. The majority engages in the same misconstruction of the coroner's report as part of its rationale in support of its finding that the trial judge did not abuse his discretion. Not only did he abuse his discretion, but worse, he relied on totally incorrect facts as does the majority.

It is impossible to determine, as the judge says he believed, and the majority seems to also rely on, which gunshot was the final deadly blow. **One thing is certain, it was not the shot which struck Anthony in the left cheek, the only shot to the head.**

The trial judge stated in his reasons for imposing a thirty-year sentence (emphasis added):

> . . . and you know what, if you would have stopped at putting those bullets in his torso **area instead of going and putting that final bullet in his head, you may not be here today.** Or, if he still would have died, you would have - - I would have been able to give you more – **I would have been able to give you a little bit more consideration.**

I again emphasize, *the evidence in the record directly contradicts the trial judge's assertion that Defendant inflicted a final, fatal shot to the head at close*

10

*range*. Furthermore, the autopsy shows that the coroner could not say in what order the shots occurred. Shawntell, present at the scene outside the residence, stated she heard two or three "light" (pistol) shots **first** and then "more than one loud" (shotgun) blast. As noted, *the autopsy report shows that the only shot that hit the victim in the "head" was a bullet that entered the left cheek and exited the right cheek*. The coroner's report indicates this wound was not life-threatening. There is nothing in the record that substantiates the trial judge's notion. He apparently was misled by the statement in the coroner's report which recites "It is my opinion that Anthony Batiste, a 26-year-old black male, died as a result of multiple gunshot wounds of the head and trunk." The observations noted in the coroner's report, and recited in his "Conclusion," show that there was only one "head" wound and it was to the left cheek. While this wound did show signs of being fired at close range, nothing in the coroner's report, or in the witnesses' statements, in any way indicate that this shot was the "final bullet," or that it was intentionally fired at close range to finish off the victim as the judge surmised. Moreover, as noted, this wound was not life-threatening as implied by the judge, but was described in the coroner's report as "injuring the soft tissues of the face prior to exiting the right cheek." More serious than abusing his discretion the trial judge completely relied on "facts" which are simply not true. The majority engages in the same error.

The trial judge, and the majority, state that the victim had already been shot with a shotgun when Defendant fired on him, but again I repeat, **the record does not support that conclusion**. In fact, witnesses' statements in the record, and the coroner's findings in the autopsy, contradict this notion. Shawntell stated she heard two to three pistol shots first, and then shotgun blasts. The autopsy report

11

shows three bullet wounds to *the back torso*, one bullet wound entering the front torso of the body, one bullet striking the left "upper-outer arm", and one bullet entering the left cheek and exiting through the right. It also shows one shotgun blast to the left buttock. Though the coroner could not establish the order in which the shots were fired, *the three bullet wounds in decedent's back indicate that Defendant fired his pistol first as the decedent had his back to him while attacking Keenan*. Then, Anthony turned to attack Defendant, at which moment Keenan fired the shotgun from about eighteen to thirty-six inches away from Anthony (according to the coroner's report) as he attacked Defendant. Defendant was still firing the pistol when this shotgun blast occurred. This is a more reasonable construction of the autopsy report and it is consistent with the eyewitness testimony of Shawntell, Anthony's sister-in-law, who drove him to Defendant's residence. Simply put, the majority and the trial judge have no basis to believe Defendant fired shots at the victim **after** he was shot with a shotgun, and no basis to believe that the one shot at close range "to the head", **the one in the cheek**, was the "fatal" shot that finished off the victim. The trial judge labored under several misconceptions which formed both the basis for accepting Defendant's guilty plea as knowing and voluntary, and formed the basis on which to sentence Defendant to thirty years at hard labor.

For the reasons stated I believe there was not a proper factual basis to support acceptance of the guilty plea and I believe the sentence imposed does not meet the constitutional standard of due process. Defendant's sentence must therefore be vacated and the matter remanded for resentencing with the trial court giving full consideration to the facts of record and the considerations enunciated by

12

the United States Supreme Court and the Louisiana State Supreme Court as I have discussed herein.

Not only does the factual basis relied upon to support Defendant's guilty plea misstate the facts contained in the record but, I further note, there is ample evidence in the record to support Defendant's initial claim of self-defense under Louisiana's "stand-your-ground" law, La.R.S. 14:20A(1), (4)(a), (B), (C), and (D) (emphasis added) also provide:

A. A homicide is justifiable:

(1) A homicide is justifiable '[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.' LSA–R.S. 14:20(A)(1).

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

. . . .

B. For the purposes of this Section, *there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:*

(1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.

13

(2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

C. *A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.*

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

Defendant had strong reasons to believe he was in imminent danger of receiving great bodily harm from Anthony who was out of control, under the influence of methamphetamines, Xanax, and marijuana and who was physically larger than Defendant. Defendant was a small, seventeen-year old male weighing about 120 pounds. Anthony was a twenty-six year old male about six feet tall weighing 152 pounds. Additionally, *the record establishes Anthony was inside Defendant's residence where he had, only moments before, been barred from entering, and therein immediately attacked Keenan and Defendant.* Both Keenan and Defendant were lawfully present in the residence where Defendant resided with his mother, sisters, and girlfriend. Anthony had trashed this residence earlier that day and physically attacked Defendant's mother and girlfriend. Defendant enjoyed the legal right to act in defense of himself, his uncle, and his mother and his girlfriend who both were present in the home and had been assaulted by Anthony earlier that day. As Justice Holmes wrote in *Brown v. United States*, 256 U.S. 335, 343, 41 S.Ct. 501, 502 (1921) (citations omitted):

> Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant he may stand his ground and that if he kills

14

him he has not succeeded the bounds of lawful self-defense. That has been the decision of this Court.

Though Defendant chose not to rely on this potential defense but instead entered a guilty plea to a lesser charge, the court must consider as a mitigating fact Defendant was defending himself and others. Moreover, I point to the following language in *Brown*, a U.S. Supreme Court case addressing whether the number of shots fired by a defendant negated his self-defense claim:

> There was evidence that the last shot was fired after Hermis was down. The jury might not believe the defendant's testimony that it was an accidental discharge, but the suggestion of the Government that this Court may disregard the considerable body of evidence that the shooting was in self-defense is based upon a misunderstanding of what was meant by some language in *Battle v. United States*, 209 U. S. 36, 38, 28 Sup. Ct. 422, 52 L. Ed. 670. *Moreover if the last shot was intentional and may seem to have been unnecessary when considered in cold blood, the defendant would not necessarily lose his immunity if it followed close upon the others while the heat of the conflict was on, and if the defendant believed that he was fighting for his life.*

*Brown*, 41 S.Ct. at 502(emphasis added).

For the reasons set forth I respectfully dissent. This case should minimally be remanded for re-sentencing with instructions to the trial court to give full consideration to Defendant's youthful age as directed by the United States Supreme Court in *Miller*, *Roper* and *Graham*, and to consider all mitigating factors as required under La. C.Cr.P. art. 894.1.

15